THE STATE v. ELMER DOWLING, Appellant.—154 S. W. (2d) 749.

Division Two, September 25, 1941.

590

*Edw. E. Hieby* for appellant.

*Roy McKittrick,* Attorney General, and *W. J. Burke,* Assistant Attorney General, for respondent.

ELLISON, J.—Appellant was convicted of assault with intent to kill one Lewis Lee Baker with a pistol, in violation of Sec. 4408, R. S. 1939, Sec. 4014, Mo. Stat. Ann., p. 2817. The maximum punishment fixed by the statute is life imprisonment in the penitentiary. The duration of the punishment assessed by the jury was thirty years. On this appeal appellant's brief makes twenty-one assignments of error in the trial below complaining: that there was no substantial evidence to support the verdict; of the prosecuting attorney's opening statement and closing argument; of the admission of incompetent and prejudicial evidence; of improper conduct of court officers; of the giving of improper instructions; of the improper modification of instructions; and of the refusal of proper instructions.

First, on the sufficiency of the evidence. Baker was a negro and a witness for the State in another criminal case wherein Isadore Londe was charged with bombing a garment cleaning establishment in St. Louis. That case was before this court on appeal last fall. [345 Mo. 185, 132 S. W. (2d) 501.] It was set for trial in the Circuit Court of St. Louis on November 21, 1938. The assault upon Baker which is the basis of the charge in the instant case occurred three days before that on November 18, 1938. For a month or so before that Baker had been working on a cotton farm about fifteen miles beyond Sikeston, which is approximately 170 miles south of St. Louis. He was there with the knowledge of the St. Louis police and within a week or so before the trial date had received two letters from the Department advising him that he would be expected to appear at the trial.

About 2 P. M. on November 18, two white men drove up in a Chrysler sedan to the cotton farm where Baker was working. Baker swore one of them was the appellant, Dowling, and the other was a man who he said on cross-examination was named Selvaggi. They greeted him and told him they had come after him. Dowling said the Chief had sent them, and added "You know Londe's trial will be Monday." One of the men gave him $5 to pay his debts. Baker notified the people on the farm of his intended departure, got his laundry and clothes at Sikeston, and thence they proceeded toward St. Louis on Highway 61. The two men were in the front seat and

Baker sat on the right side of the rear seat. They stopped three times on the trip: once to buy whiskey and cigarettes for the kidnappers and Baker. Further on, Dowling said: "When I get up here I got to call in and report to the chief." It got dark. On a side road they came to a grove and a tavern with a red electric sign on it that said " 'Zimmer' something like that, 'Beer Tavern.' " The witness identified the place from photographs in evidence showing a sign "Duffy-Zimmer."

The automobile stopped there and Dowling got out and went into the tavern saying "I will go and see if they are in here." Witness Baker remained outside with the other man, but through a tavern window could see Dowling inside talking to someone. Dowling came out and upon being asked "Did you find him" answered "No, he is here at this house over here drunk." The other man said "Let's go over and wake him up." They drove on "a pretty good little piece from it—on another road," to a small house with a porch on it. It was dark inside but Dowling had a flashlight. Baker demurred about going in but the little man pushed and urged him in. They stumbled through two or three rooms but couldn't find the man they were looking for. The other man said "Let's go upstairs," and as Baker turned around the other man shot him in the eye. Baker fell in the doorway and Dowling stepped over him. The other man said "you had better shoot him again." Dowling put his pistol against Baker's neck and fired. The two men tiptoed out of the house and Baker crawled outside and into some weeds.

Presently two cars returned to the house, one being like the car in which he had ridden up from Sikeston, and some men went into the house for a short time. One of them halloed "he is gone" and they left driving rapidly. Baker could see the electric sign on the tavern. He crawled to a white man's house and to a negro's home. He was repulsed both places, but finally found his way to the City Water Works. A man there called the Highway Patrol. He told all these men he had been in an automobile wreck. The patrolmen took him to the County Hospital. He was there for ninety-one days. Neither the white man, the negro, the City Water Works employees nor the State Highway troopers thus mentioned by Baker in his testimony were called as witnesses by either side. But it does appear that Capt. Murphy and Lt. Dirrane of the St. Louis Police Department were summoned to the County Hospital about 3 A. M. the next morning, November 19, and saw and interviewed Baker. The physician at the County Hospital testified Baker's wounds were such as might have been made by bullets. The one entering the eye was not recovered. The neck wounds apparently extended clear through; at least they corresponded in position on both sides. The wounds might have been fatal and would have produced shock but not necessarily unconsciousness.

Later that same morning Capt. Murphy, Lt. Dirrane and deputy sheriffs Erickson, Baker and Newbold of St. Louis County went to the vacant cottage where the alleged shooting occurred. They found a large spot of what appeared to be blood in one of the rooms with a .38 caliber bullet imbedded in the wooden floor about the middle of the spot. Two discharged .38 shells were found on the floor. There was a trail of similar stains leading from the large spot along the base of the walls and up to a height of four or five feet in some places. This trail passed through several rooms and emerged on a back porch and continued to the ground. Close by the large stain a board or boards of the floor had been raised and there was a hole in the ground underneath. The witnesses' estimates varied as to the dimensions of the hole but it was large and deep enough to permit the burial of a human body therein. Excavated dirt was on one side and there was a sealed sack of lime in a nearby closet. The dirt was somewhat dry but the witnesses refused to make a deduction from that fact as to whether the hole had or had not been recently dug. One witness said, "You see the hole was underneath the house, and was dry"— in other words, might be dry for that reason. The lime in the sack was partly lumpy, from which the defense inferred it was old and had been there some time. About twenty feet from the door of the cabin in the soft ground there were automobile tire prints. Plaster paris impressions were taken of the tracks made by the front wheels, and later when Dowling's car was discovered, as hereinafter narrated, the tires were compared with these impressions. They were the same type of treads, both Goodrich, but the court refused to admit the opinion of the witness as to the degree of wear on the tires because he was not qualified as an expert.

This further corroborating evidence was introduced, circumstantial in nature. The purchase of a 1938 Chrysler, Royal Sedan by or in the name of Elmer Dowling was financed by the National Bonding and Investment Company on August 8, 1938. The serial number of the automobile was 7573196 and the motor number C-18-42479. There were to be twenty-four monthly payments of $40 each, beginning on September 1, 1938. The first three payments were made but the one due December 1, 1938 was not. The financing company made a search for the automobile and located it in the Melbourne Garage in St. Louis on December 3. It was turned over to the police department and photographs of the exterior and interior were made. The State Automobile license on the car was No. 558-595. That license and the certificate of title had been issued in the name of Elmer Dowling.

The automobile was exhibited by the police to Baker, who identified it at the time and at the trial as the one in which he had been conveyed by Dowling and the other man from Sikeston to the cottage where he was shot. In external and interior appearance and fittings

the two were the same, but the two facts that individualized the automobile were that there was a torn or ripped place on the back or top of the front seat cover and the ash tray for the right side of the rear seat, where Baker rode, had several short smoked Lucky Strike cigarette butts which were like those Baker said he deposited there on the trip. Also the service manager of the Melbourne Garage testified the automobile had been left there on November 19, 1938, at 8:20 A. M., this being the morning after the shooting, by a man giving his name as J. Adams. But the witness saw very little of him and could not identify him—that is, couldn't say whether Dowling was or was not the man. The car remained in the garage for two weeks without being called for until it was found by the finance company.

This incident apparently was the first circumstance that put the police on Dowling's trail. But there was another. Mrs. Eva Hawkins was manager of the Norgene Apartments at 4271 Washington Avenue. On November 18, 1938, the day of the shooting, which was Friday, about 10:30 in the morning as she recollected, Mrs. Hawkins rented apartment No. 106 for one month to a man who gave the name of E. J. Keeler, but whom she identified as appellant Dowling. He said he was a bookmaker. He paid down $20 of the $37 rent and said he would bring his luggage and pay the balance about 6 o'clock that evening. He did not return until about 10:30 P. M. She saw him the next morning, and the next day, Sunday, November 20, on which occasion she had some conversation with him about equipping the apartment with linens. He said the absence of these would not inconvenience him as he expected to be out of town. The witness did not see Dowling any more, but she entered the apartment on about December 6th because the bathroom window was open and it had started to snow and rain. There was moulding food on the table and she saw a shirt with a laundry mark on it "Elmer Dowling." She called the owner of the building and the police came out.

The police kept a watch on the apartment until December 17, the end of the rent month, and then removed the personal effects of the tenant, consisting of clothing, a gray sweater coat, shoes, hats, shirts, etc. Some of the clothes had a cleaner's mark "D. O. W.," some of the shirts were marked "Dowling," and some "E. Dowling." A deputy sheriff testified that at the jail Dowling had a white shirt with a laundry mark "Dowling." One handkerchief found in the apartment had a "D" in the corner, and there was a pipe with "E. J. Dowling" on the stem. In addition, two .38 caliber loaded cartridges and a .32 caliber automatic pistol were found. Also there was an Eversharp lead pencil with the name "Izzy Londe" in gold letters; and two St. Louis evening newspapers of November 19, 1938, the day following the shooting of Baker. Isadore Londe, it will be remembered, was the defendant in the bombing case in which Baker was a witness. A ballistics expert testified the bullet found imbedded in

the floor of the cottage, the empty shells picked up there, and the two loaded shells found in the apartment, all could be fired in the same firearm, although there was no evidence that the bullet and empty shells had been so fired. No pistol was ever produced as the instrument of assault. Baker said Dowling was wearing a light hat with a black band and a light gray wool sweater during the kid- napping. A hat and sweater coat of that description were among the articles found in the apartment.

Further, Theodore Hirschausen, a bartender at the Duffy & Zimmer Tavern, testified Dowling was there on the evening of December 18, 1938, about 7:15. He came in the front door alone, invited those present to have one or two drinks, talked about a good place to hunt, and was gone in five minutes. He was wearing a light hat but the witness said his jacket was brown chamois and not light gray wool. Another resident bartender at the tavern, W. H. Rawden, substantially corroborated Hirschausen as to Dowling's brief visit at the place and about the time mentioned. A bartender at the Creve Coeur gun club, also operated by Duffy & Zimmer, and even closer to the old cottage than was the tavern, said Dowling came there about 7:30 that evening with a stranger and bought two drinks. The other man was not Selvaggi. They were there about ten minutes.

Fred Jones, a druggist at Sikeston said Dowling was in his store about a week before the shooting, and remained a while without talking or buying anything except a chance on a punch board. A black four-door sedan, in which he came and left, waited outside. It was too dark to see another man seated in the car. The witness saw Dowling's picture in the newspaper after the assault and fixed his identity from that. Clay Higdon, manager of the cotton farm near Sikeston, said Baker quit work there on November 17, but was in the office the next day about 1 P. M. The witness saw two men drive up in a good sized black sedan. One of them was Dowling. Baker talked to them, got in the car and left.

An indictment against Dowling was returned on December 30, 1938. He was not found and arrested until January 14, 1940, more than a year later. At that time he was questioned by the police as to his whereabouts but refused to say anything or tell where he had been, until he had seen an attorney. The admission of this evidence is challenged by appellant and that assignment will be considered later. He told Arnold Williams, chief deputy sheriff of St. Louis County, that before his arrest he had been mostly up at the Lake of the Ozarks (in central Missouri) living in the woods and sleeping in barns, but also in other parts of Missouri. He also denied that he lived at the Norgene Apartments, 4271 Washington Avenue, on November 18, 1938, and that any property found there belonged to him. He did not testify at the trial.

Aside from whatever contradictions and admissions the defense

could elicit from the State's witnesses, the evidence for appellant consisted of proof that the negro Baker, prosecuting witness in this case and also a witness for the State in the Londe case, had been kept under surveillance of the police and given sinecure jobs in city institutions. There was also testimony that Baker made overtures to two men named Bessen and Engel, the purport of which was that for $2000 (later raised to $2400) he would retract his testimony in a prior deposition implicating Dowling, and would absent himself from the trial. Negotiations progressed to the point where Baker wrote an unsigned brief statement saying "I won't sign the papers, I made a mistake, Dowling is not the man."

Bessen and Engel, or one of them, said there was an understanding that Baker should sign the statement when the money was paid to him. The "papers" mentioned in the statement referred to a deposition Baker had given but not yet signed. Baker admitted the statement was in his handwriting, but asserted the overtures for the bribery were not made by him, but to him by Bessen and Engel; and that he notified the police who advised him to go through with it so the bribers could be trapped. In this he was corroborated by two police officers, but Baker never reported further to them and they did nothing about it. Bessen and Engel said they were trying to trap Baker and never intended to pay him the money. Cordez Delworth, a lawyer associated with Mr. Falzone, one of appellant's counsel, testified that after five previous unsuccessful efforts to serve a deposition subpoena on Baker, the latter met him by arrangement, and at that meeting said he was not afraid of the St. Louis police, and that all he wanted to know was that he was going to get something for himself.

The foregoing is not, of course, all of the testimony in this long record of 827 pages. The testimony of Baker alone covers 265 pages. None of the numerous exhibits, including photographs and letters, have been brought up, as it was appellant's duty to do, Secs. 4132, 4147, R. S. 1939, Secs. 3742, 3757, Mo. Stat. Ann., pp. 3287, 3295. [State v. Kelsay (Mo. Div. 2), 18 S. W. (2d) 491(4).] But we doubt if they would have added much to the facts reviewed above. We think the record shows a strong case was made by the State. Indeed, while appellant's counsel challenges the sufficiency of the evidence by an assignment of error, and under his Points and Authorities cites a decision holding it is our duty to examine the entire record (which we have done) still the brief does not indicate much confidence in the assignment, because the argument ignores it. No effort whatever is made to point out wherein the State's showing was deficient. If counsel's theory be that Baker was proven to be corrupt by his own admission that he wrote the statement retracting the testimony in his deposition and conflicting with his story at the trial, we answer that this merely goes to the credibility of his testimony,

which was a matter for the jury, and that the outlines of the case are established by other evidence which is credible and unimpeached.

Appellant's brief stresses an assignment complaining of the admission of evidence showing Baker was a witness for the State in the Londe bombing case, and that the prosecutor declared to the jury "Baker was a very important witness in a bombing case in which Isadore Londe was the defendant." The brief asserts the Londe case had gained wide and unsavory notoriety in St. Louis and St. Louis County, in consequence of which appellant, Dowling, was greatly prejudiced by evidence and statements connecting him therewith. Nevertheless it concedes such evidence would have been competent to show a motive for the assault on Baker if there had been further proof that Dowling was interested in the case, or in Londe—thereby warranting an inference that he was seeking to get Baker out of the way as a witness in that case. But it is insisted there was no such proof.

We do not agree. The assault was committed only three days before the Londe case was set for trial. When Dowling and the other man, masquerading as emissaries of the St. Louis Chief of Police, called for Baker at the cotton farm Dowling referred to the impending trial of the Londe case. The assault was committed at an isolated place with an apparent intent to conceal and destroy the corpse of the victim. There was no other explainable reason for the unprovoked assault. And a pencil bearing the name "Izzy Londe," defendant in the Londe case, was found in Dowling's abandoned apartment, which had been rented on the day the assault occurred. We think all this was sufficient to warrant a finding by the jury that the assault was committed for the reason mentioned, even though there was no proof that Dowling and Londe had theretofore been associated in the underworld.

During the examination of Chief of Detectives Carroll he told about the arrest of Dowling. He was asked if he thereafter questioned Dowling about his whereabouts, and answered in the affirmative. The next question was, "What did he say?" An objection on the ground of irrelevance and immateriality was overruled and Carroll answered, "Well, he said he wasn't going to say anything until he seen an attorney." This occurred after Dowling had been taken to police headquarters. Appellant's counsel moved for a mistrial because the answer was "a comment upon the constitutional rights of the defendant," but the objection was overruled. The next question was, "What else did he say?" Carroll replied that he remarked to Dowling. "You had a pretty good hide-out," and that Dowling "refused to tell us where he had been." This was after the arrest and while the officers were taking Dowling to headquarters in a police car. A similar objection and motion for mistrial because this

violated the constitutional rights of the defendant was overruled. These rulings are bitterly assailed by appellant.

We should add, however, before discussing the questions raised, that Chief Carroll, in his testimony subsequent to the above, said he told Dowling about getting ''a trunk and some clothing belonging to you'' in the apartment at 4271 Washington Avenue, and that Dowling retorted ''No, you haven't got anything belonging to me,'' and later said he didn't know anything about it. The record does not clearly disclose whether this was a part of the conversation at police headquarters, detailed above, but apparently it was. There is no contention that the State's counsel referred in argument to Dowling's refusal to discuss his whereabouts, or that they contended his silence was an admission of guilt. In other words, there was no aggravation of the error, if it was error, to admit Chief Carroll's testimony concerning Dowling's refusal to talk. In this connection it will also be remembered deputy sheriff Willmann testified that sometime later, after Dowling had been turned over to the sheriff of St. Louis County, he stated he had been up at the Lake of the Ozarks living in woods and sleeping in barns, and had also gone to various parts of Missouri while the search for him was going on.

This assignment has given us some concern. After the cause was submitted we wrote an opinion overruling it and affirming the judgment. Our theory then was that when appellant answered the question concerning his whereabouts during the year before his arrest, by stating ''he wasn't going to say anything until he had seen an attorney''—in thus answering, we say, we thought he had simply claimed his rights; and that while the statement ought not to have been proven, still it was not incriminating and therefore the error was not reversible. Our view was the same about Chief Carroll's further testimony that appellant ''refused to tell us where he had been'' when the Chief remarked ''you had a pretty good hide-out.'' But appellant has filed a vigorous motion for rehearing, and after considerable research we are able to find only one decision supporting our ruling on the first answer. It is Commonwealth v. Smith, 270 Pa. St. 583, 113 Atl. 844, 846(5), where the state proved an officer sought to question the defendant and the latter refused to answer on advice of counsel. The court said: ''That was a proper attitude for a defendant to take, and did no harm.'' Regarding the Chief's statement that appellant refused to ▮ tell where he had been, it has been held in California that if a defendant *denies* an accusation the incident cannot be shown, but if he merely remains silent or refuses to talk it can be. [People v. Graney, 48 Cal. App. 773, 192 Pac. 460, 461.] In both of these cases the defendants were under arrest and in custody.

But the law is otherwise in this and many other states. Silence of the accused when not under arrest, and in circumstances such

that only a guilty person would have remained silent, may be shown. After arrest or while in custody the evidence is inadmissible because he is under no duty to speak. [State v. Bowdry, 346 Mo. 1090, 1096, 145 S. W. (2d) 127, 129(5).] The same is true of undenied accusations made by third parties in his presence. [State v. Kissinger, 343 Mo. 781, 786, 123 S. W. (2d) 81, 83(4).] The appellant in this case was both in custody and under arrest. When questioned he did not remain silent, in the sense of mute. His first answer was that he would not say anything until he had seen a lawyer. After that he refused to tell the Chief where he had been. When questioned about the personal effects found in the Washington Avenue apartment, he said "No, you haven't got anything belonging to me," and later declared he didn't know anything about it.

Were these statements admissible? Under the great weight of authority we think not. There are numerous cases holding it cannot be proven that the defendant said he declined to answer on the advice of counsel;[1] or refused to give a statement;[2] or declared he had nothing to say;[3] or had been warned his statements would be used against him.[4] There are still more ruling his silence cannot be used against him when he was in doubt about his rights,[5] as would be true of one who desired to withhold any statement until he had had legal advice.

The learned Assistant Attorney General argues the foregoing rules do not apply because the State is entitled to prove the entire conversation where part of it is shown, citing: State v. Murphy, 345 Mo. 358, 361-2, 133 S. W. (2d) 398, 400(11); State v. Hardin, 324 Mo. 28, 36, 21 S. W. (2d) 758, 761(4); State v. Lovell, 235 Mo. 343, 355 (III), 138 S. W. 523, 526(6); State v. Capotelli, 316 Mo. 256, 263, 292 S. W. 42, 45. This is true where part of the same conversation is

(1) People v. Conrow, 200 N. Y. 356, 93 N. E. 943, 948(4);
People v. Pfanschmidt, 262 Ill. 411, 449, 104 N. E. 804, Ann. Cas. 1915C, 1171;
People v. Hanley, 317 Ill. 39, 147 N. E. 400;
People v. Blumenfeld, 330 Ill. 474, 161 N. E. 857, 863;
Vaughan v. State, 7 Okla. Cr. Rep. 685, 127 Pac. 264, 266, 42 L. R. A. (N. S.) 889;
(2) People v. Rothe, 358 Ill. 52, 192 N. E. 777, 779(7);
(3) Diblee v. State, 202 Ind. 571, 177 N. E. 261, 264(8);
(4) Simmons v. State, 50 Tex. Cr. Rep. 527, 97 S. W. 1052, 1053(3);
Couch v. State, 58 Tex. Cr. Rep. 505, 126 S. W. 866, 868;
(5) Commonwealth v. Kenney, 53 Mass. 235, 237, 46 Am. Dec. 672;
Merriweather v. Commonwealth, 118 Ky. 870, 82 S. W. 592, 595, 4 Ann. Cas. 1039;
O'Hearn v. State, 79 Neb. 513, 113 N. W. 130, 133, 25 L. R. A. (N. S.) 542, 556;
People v. Daily, 178 Mich. 354, 144 N. W. 890, 894(4);
People v. Pfanschmidt, 262 Ill. 411, 449, 104 N. E. 804, Ann. Cas. 1915C, 1171;
People v. Hanley, 317 Ill. 39, 147 N. E. 400;
People v. Blumenfeld, 330 Ill. 474, 161 N. E. 857;
People v. Kozlowski, 368 Ill. 124, 127, 13 N. E. (2d) 174;

incriminating and part is not.[6] But here no part of the conversation between appellant and Chief Carroll was incriminating. In his first answer appellant refused to talk until he had consulted an attorney; in the second he refused to say anything; and in the third he denied the accusation. It is true that sometime later, after he had been transferred from Chief Carroll's custody in St. Louis to the county jail in St. Louis County, he made damaging admissions to deputy sheriff Wellman about having spent the year between his indictment and arrest in central Missouri sleeping in barns, etc. But that was a wholly different conversation, with a different person, at a different time and place.

Section 22, Article II of our Constitution provides the accused in a criminal case shall have a right to appear and defend in person and by counsel. This applies also to proceedings before the trial. Section 23 of the same Article provides no person shall be compelled to testify against himself in a ▮▮▮ criminal cause. The immunity afforded by this section protects the accused against self-incrimination before any tribunal or in any proceeding. Section 4082, R. S. 1939, Sec. 3693, Mo. Stat. Ann., p. 3247, provides: "If the accused shall not avail himself or herself of his or her right to testify, . . . it shall not be construed to affect the innocence or guilt of the accused . . ."

Obviously these provisions cannot be violated indirectly at the trial by showing the defendant had theretofore been subjected to interrogation and stood on his constitutional rights. Under our law when the defendant makes damaging admissions against interest while under arrest the big question is whether they were *voluntary*. [State v. McDaniel, 336 Mo. 656, 673-4, 80 S. W. (2d) 185, 194.] Proof of a defendant's *refusal*, oral or mute, to make such admissions does not show voluntary action on his part. And the very refusal may in the minds of the jury be damaging. As is held in People v. Conrow, 200 N. Y. 356, 93 N. E. 943, 948(5), such evidence is not harmless. We have concluded the introduction of the appellant's statements aforesaid requires a reversal and remanding of the cause. Many cases on the question are collected in 111 A. L. R., p. 1235, note.

There are other assignments of error in appellant's brief, but they are of such nature that they will not occur on a retrial.

For the reasons stated the cause is reversed and remanded. All concur.

---

(6) Commonwealth v. Kenney, 53 Mass. 235, 237, 46 Am. Dec. 672;
 . Commonwealth v. Trefethen, 157 Mass. 180, 31 N. E. 961, 967-8, 24 L. R. A. 235, 244(8);
 People v. Daily, 178 Mich. 354, 144 N. W. 890, 894(4);
 People v. Harrison, 261 Ill. 517, 104 N. E. 259;
 People v. Cardinelli, 297 Ill. 116, 130 N. E. 355, 359(1);
 City of Chicago v. Montgomery, 194 Ill. App. 515.