**STATE of Missouri, Respondent,**

**v.**

**Walter Victor LAY, Jr., Appellant.**

**No. 52817.**

Supreme Court of Missouri,
Division No. 1.

April 8, 1968.

Motion for Rehearing or to Transfer to Court En Banc Denied May 13, 1968.

Norman H. Anderson, Atty. Gen., Jefferson City, James J. Sauter, Sp. Asst. Atty. Gen., St. Louis, for respondent.

William Barton, Jefferson City, for appellant.

HENLEY, Presiding Judge.

Defendant, charged by information with second degree murder,[1] was found guilty by a jury and his punishment assessed at imprisonment for a term of ten years. His motion for new trial was overruled and judgment was entered sentencing him in accordance with the verdict. He appeals from that judgment. We affirm.

Deceased, Ralph Hutt, met his death on the night of February 28, 1966, as the result of a stab wound inflicted by his friend, the defendant (hereinafter sometimes referred to as Lay), during their "scuffle" in the 400 block on the south side of East High street in Jefferson City. Both were negro students at Lincoln University; they had been roommates during the first semester of the 1964–65 school year; they were living in the same dormitory in February, 1966, but were not roommates. Finishing their studies shortly before 6:00 p.m., they decided to walk to the downtown area to "* * * shoot a few games of pool * * *," agreeing to wager twenty-five cents on each game; en route, they stopped at a store where defendant purchased a pocket knife "for protection * * *" in the event of a continuation of "* * * difficulties between the fellows on the hill and the 'foot'."[2] They played several games of pool at the Capital Bar and Billiards, defendant winning most of the games and, of course, the money; Hutt expressed the need to purchase socks before the stores closed so they walked to one nearby; they returned to the pool room, "* * * shot a couple

---

1. Section 559.020, RSMo 1959. All references to statutes are to that revision and V.A.M.S.

2. The "hill" is described to be the hill on which the campus is located; the "foot" as that area adjoining Lafayette street, alongside the campus, at the bottom of the hill.

more games, * * *" then left to return to the campus. They walked east on the south side of High street, defendant on Hutt's right side. After passing the Missouri Hotel at 400 East High, defendant began "teasing" Hutt about losing the pool games; during this "teasing," Hutt "* * * pulled his hand from his pocket and flicked [defendant] on the cheek with his fingernail. * * *" Defendant said he thought the "flick" was from a straight-edge razor he had last seen in Hutt's possession about a year before. This incident led immediately to the "scuffle," about which defendant testified: "Well, I was signifying[3] with Ralph about losing the pool games and, at this time, Ralph had pulled his hand out of his pocket and flicked me on the cheek with his fingernail, which I thought at this time was the razor that he had; and I pulled my knife out of my pocket and told Ralph to 'Look out' and 'Stop,' and Ralph stepped in front of me and come up in a position like he was trying to throw a punch, as if he had his razor in his hand, and I thought he did have. And during this struggle he was stabbed."

Immediately after defendant stabbed Hutt, he threw the knife to the ground, opened Hutt's coat and tried unsuccessfully to stop the bleeding; telling Hutt to remain still he went from door to door trying in vain to get help, but Hutt followed him and fell in the street. Defendant picked him up and carried him to a spot between the sidewalk and curb near the Missouri Council of Churches' office building, on the north side of High street. At this point defendant saw a man leaving the office building and called to him for help, saying "* * * this boy was bleeding." This person returned to the building and within a few minutes an ambulance arrived. In the meantime, police arrived on the scene, responding to a call that a man " * * * was bleeding to death * * * in the 400 block of High Street."

Officer Bob Roark testified that when he arrived at the scene a crowd was around Hutt, including other police officers, Lay, and a doctor who was administering aid to Hutt; that as he walked through the crowd he asked, not directing his question to anyone in particular: "What happened?"; that Lay, who was bending over Hutt, spoke up, saying: "Me and my friend were walking down the street, across the street on the sidewalk, and a white [boy or man] come up and stabbed my friend * * *;" that Lay described Hutt's assailant as wearing "* * * white pants and a black trench coat * * *," and that he was "* * * blond-headed * * *."

Officer Wyman Basinger testified that he was one of three other officers who responded to this call; that the call was received at the police station shortly after 9:00 p.m., and they left for the scene immediately; that Lay was there and "* * * flagged us down * * *;" that Hutt was still alive, moaning; that an ambulance arrived shortly and he and Lay (without being asked to do so) got in the ambulance with Hutt for the trip to Charles Still Hospital; that en route to the hospital he asked Lay "* * * if he saw who did it * * *" and received the reply that "* * * it was a white boy * * *" wearing "* * * white trousers and a dark coat * * *;" that within a few minutes after arrival at the hospital "* * * the doctor * * * pronounced him [Hutt] dead * * *;" that he "* * * asked him [Lay] if he wanted to ride back downtown and come down to the station to identify anybody that we brought in * * *;" that Lay indicated that "* * * he wanted to help identify and get the man who stabbed his buddy * * *," and went with the officer to the police station for that purpose; that Lay was obviously upset, nervous, and crying somewhat, both at the hospital and later at the police station; that at no time, either at the hospital or the police station,

3. Teasing.

was Lay under suspicion, nor did anyone have any reason to suspect or restrain him, and he was not restrained or suspected; that in fact the officers recognized the shocking ordeal Lay had been through in seeing his friend stabbed to death and showed their sympathy for him by making him as comfortable as possible during the night as individual suspects were brought in for identification by him.

During the course of the night, between approximately 10:30 p.m. on the 28th and 3:00 a.m. on March 1st, ten suspects were picked up and brought to the police station; the tenth person, a 15 year old white youth, met the description exactly and was positively identified by Lay as Hutt's assailant. Through these hours Lay was in the role of assisting the police and no questions were addressed to him, except those pertaining to description of the assailant before the first suspect was picked up, and as each suspect was brought in. As stated by the officers, he was never during all this time under any suspicion and, of course, he was not under arrest or restrained.

Clarence Mack, a negro police officer, testified that at about 3:30 a.m., he and Lay were in the radio dispatcher's room; that "* * * he [Lay] walked out and, I believe lit a cigarette and he beckoned for me to come to him, and I walked over * * *;" that Lay asked: "What are they going to do about this * * *"; that he (Mack) said: "* * * they are making every effort * * * and * * * they'll have him by morning * * *;" that Lay then said: "I tell you, * * * '(M)y prints were on that knife * * *;'" that he (Mack) asked: "* * * Your prints

are on the knife?"; and, "Did you tell them your prints were on the knife?"; that he (Mack) asked him [Lay], "(D)id he want to tell Captain Dickson about it, and he said, 'Yes' * * *;" that he (Mack) knocked on Captain Dickson's door and "* * * Lay told him [Dickson] he wanted to talk to him, by himself;" that Captain Dickson invited Lay in, excused all others from the room, and asked him to be seated. Lay then told Captain Dickson that his fingerprints were probably on the knife and, later "* * * I'm the one that stabbed Ralph Hutt." More about this later.

■ The first six of the fourteen points briefed by defendant may be summarized as follows: That the court erred in admitting in evidence oral and written statements or confessions made by defendant to the police while in custody in the police station, because the police failed to warn him of all his constitutional rights and afford him the opportunity to exercise those rights before subjecting him to questioning as required by Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 1630 [66, 67], 16 L.Ed.2d 694.[4]

The court held a hearing outside the presence of the jury to determine the voluntariness and admissibility of defendant's admissions and confessions. At this hearing Captain Walter Dickson testified that when Officer Clarence Mack and Lay appeared at his office door at about 3:30 a.m. and Mack stated, "* * * Walter's got something he wants to tell you * * * that his fingerprints could be on that knife * * *," he (Dickson), for the first time, suspected that defendant was Hutt's assailant; that before that moment neither he

4. Defendant relies primarily on the Miranda case, but cites 34 additional authorities; we note here the first three cited under each of the first six numbered points of his brief, omitting his citations to constitutions, statutes, rules and law review articles: Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L. Ed.2d 977; State v. Bradford, Mo., 262 S.W.2d 584; State v. Dowling, 348 Mo.

589, 154 S.W.2d 749; Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed. 2d 70; Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461; Haley v. State of Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); In re Groban, 352 U.S. 330, 77 S.Ct. 510, 1 L.Ed.2d 376; Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882.

nor any of the other officers suspected or had reason to suspect defendant; that up to that moment the only purpose of questions asked of Lay was to secure an accurate description of the "young man" Lay said had walked up, stabbed his friend, Hutt, and had " * * * broke and ran down the street, headed west * * *;" that the point of view and demeanor of all those present at the police station that night, both the police and Lay, was that "* * * We were working hand in hand, he was just helping us out." Captain Dickson further testified that when Lay walked in and sat down he (Dickson) said: "* * * I think Walter, I know what you are going to tell me and, before you tell me, before you say anything, I want to advise you of your rights. * * * 'There is a telephone, Son, if you want to call anyone. Call your mother, father, friend, or anyone from the faculty, and, if you haven't got the money, the Police Department will pay for the long distance call * * *;'" that defendant indicated he did not want to call anyone, saying: "No, not right now." Captain Dickson further testified that before he asked defendant one question regarding the incident he advised him of his constitutional rights; that he warned him that he had the right to remain silent; that "* * * anything he said would be used for him or against him in court;" that he had the right to have an attorney present; and, that "* * * if he couldn't afford one the court would appoint him one * * * before the questioning started * * *." Captain Dickson further testified that defendant stated that he understood his rights, that he did not want an attorney present; that defendant said "* * * he wanted to make a statement, he wanted to make a clean breast of it." Captain Dickson further testified that defendant then told him about the knife and that he had stabbed Hutt; that other officers were called into the office and he (Dickson) again advised him of his rights in the presence of these officers; that defendant again confessed to stabbing Hutt; that the confession (State's Exhibit 5), in

question and answer form, was reduced to writing, read by defendant, some corrections made by him, and signed by defendant and witnessed by six officers. Another officer testified at this hearing, corroborating the testimony of Captain Dickson. Defendant offered no evidence. At the close of the hearing the court found that the confession was voluntary and admissible in evidence. Later, substantially the same testimony was presented to the jury and, over defendant's objection, the admissions and confessions admitted in evidence.

The state demonstrated by its evidence that all procedural safeguards required by Miranda had been complied with by the police before questioning defendant and that defendant had knowingly and intelligently waived his rights. The court did not err in admitting the oral and written confessions in evidence.

Defendant argues that he was only "* * * eighteen years of age, among strangers, without friends, relatives, counsel [and was] nervous, sick and scared * * *" before and during his questioning by police; therefore: (1) he did not knowingly and intelligently waive his rights; (2) the warnings given him by the police were no more than a "hollow recitation" of his rights; (3) questioning by the police should have stopped when he indicated that he would want to make a telephone call "later." It is quite clear from the record that there is no merit in this argument. He also argues that the requirements of Miranda were not known to the police when he was interrogated, because Miranda was not decided until approximately five months later; therefore, the police could not have given the Miranda warnings, and did not. The record refutes that argument with this simple answer: the warnings were given; Captain Dickson attended an F.B.I. school before February, 1966, and he learned there the procedure he followed in this case.

Defendant's next point is that the court erred in giving all instructions. He

states no grounds why any of these instructions are erroneous, except instruction number C–3, a definition instruction. He has thus abandoned the point as to the other instructions. He contends that instruction C–3 "overdefines" the word "malice" by using unintelligible words and is therefore misleading. He says the italicized words in this part of the instruction are unintelligible: " 'Malice,' in is legal sense, * * * means that condition of the mind which prompts a person intentionally to take the life of another without just cause, justification or excuse, and signifies a state of disposition that shows *a heart regardless of social duty and fatally bent on mischief.*" He concludes that these words are unintelligible, because during their deliberations the jury asked the court what the words "fatally bent" meant. He gives no other reason for his conclusion and, in asking this court to review carefully the instruction, he leaves it to us to search for a good reason.

We do not agree with the reasoning that because the jury inquired as to the meaning of "fatally bent" the words italicized are unintelligible. Nor does this reasoning lead to the conclusion that the jury did not understand the words when they later arrived at their verdict; the opposite is presumed.

This definition of malice, and the use of the particular words criticized by defendant, has been recognized and approved by this court for at least ninety years. State v. Wieners, 66 Mo. 13, l.c. 20 (1877); State v. Gadwood, 342 Mo. 466, 116 S.W.2d 42, 58 [24], and cases cited. Defendant has not demonstrated that the jury was misled to his prejudice by this instruction. State v. Clark, Mo., 412 S.W.2d 493, 497 [4]. The court did not err in giving instruction C–3.

Defendant's next point is that he was denied his constitutional right to equal protection of the law and a fair trial, because no negroes were drawn by the board of jury commissioners as members of the panel of petit jurors selected to serve at the December, 1966, term of court; that negroes were excluded, because of their race.

A motion to quash, made on the ground there were no negroes on the panel, was filed; evidence was heard, and the motion overruled.

The evidence on this issue was substantially as follows: According to the official 1960 census Cole county had a total population of 40,761, of which 37,580 (92.2%) were white and 3,181 [5] (7.8%) were nonwhite. Of the twenty-four petit jurors and twenty-four alternate petit jurors drawn by the board for service at the December term, one, an alternate, was negro; the remainder were white persons. Guy M. Sone, circuit clerk, and Lucille Sheley, his deputy, testified that the names of persons making up the four hundred (required by § 494.240) from which petit jurors and alternates are drawn are taken from each township of the county according to the relative population; that the sources for these names are the general election poll books and telephone books; that these names, without further identification of the person bearing the name, are put on separate slips of cardboard of the same size and kind and the slips in a box for the township where that person resides; that in selecting the total of twenty-four petit jurors and twenty-four alternates these slips are drawn from each township box until the proper number from each township (according to its relative population) are drawn to reach the total required for service at the next term; that the slips are drawn singly from each box through a cubbyhole and it is not possible to see what

5. Of this number 1,116 are shown by the census to be inmates of an institution in Jefferson City. The only institution in that city capable of housing this number is the state penitentiary, whose inmates are ineligible to serve as jurors. Section 494.020(1).

name is on the slip until it is drawn; that the names are put on a list in the order drawn, without other identification, except address; that of the total of four hundred names in the several township boxes the names of negroes are in proper proportion to the names of white persons; that for at least the past ten years the names of negroes have been drawn to serve on petit juries and that negroes have, in fact, frequently served on juries in Cole county in the trial of both criminal and civil cases; that negroes are not excluded from service on juries, because of their race.

In Norris v. State of Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074, the Supreme Court of the United States held that the exclusion of negroes from a petit jury by which a negro is tried, resulting from the systematic and arbitrary exclusion of negroes from the jury lists solely because of their race or color, is a denial of equal protection of the laws guaranteed by the Fourteenth Amendment. The court summarized the evidence on which its decision was based, stating: "We think that the evidence that for a generation or longer no negro had been called for service on any jury * * *, that there were negroes qualified for jury service, that according to the practice of the jury commission their names would normally appear on the preliminary list of male citizens of the requisite age but that no names of negroes were placed on the jury roll, and the testimony with respect to the lack of appropriate consideration of the qualifications of negroes, established the discrimination which the Constitution forbids." 294 U.S. 1.c. 596, 55 S.Ct. 1.c. 583.

█ There is no controversy as to the constitutional principle involved; the question is its application to the facts. Defendant says these are the facts: (1) that no negro was drawn from the list of four hundred to serve on the panel as primary (not alternate) jurors, and (2) that the names of negroes were not drawn for service as primary and alternate jurors in the proportion that the negro population relates to the total population of the county. He asserts that these facts alone, of themselves, make an unrebuttable case of denial of the equal protection the Constitution guarantees; therefore, he says, he is entitled to have his conviction reversed. In support of this position he cites Whitus v. State of Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599.

Facts (1) and (2) are accurate, but we do not understand that under the law these facts produce the conclusion he draws. Whitus v. State of Georgia, supra, does not so hold. The facts in Whitus were: (1) no negroes had ever served on petit juries in Mitchell county, Georgia, within the memory of witnesses, although 45% of the population of the county was negro; and, (2) the list from which petit jurors were selected was made up from segregated tax returns on which the names of negroes were designated by a "(c)" placed opposite their names [6] and on the basis of personal acquaintance of the jury commissioners. The court held that this proof constituted a prima facie case of purposeful discrimination which the state had failed to rebut. The court mentioned that there was a disparity between the percentage of negroes on the tax digest (27.1%) and the petit jury venire (7.8%), but did not reverse on that ground, saying that this fact was unnecessary to disposition of the case. 385 U.S., 1. c. 552, 87 S.Ct. 643.

The facts on which defendant relies do not make a prima facie case of purposeful discrimination. There is no proof that negroes have not served on Cole county petit juries; the proof is to the contrary. There is no proof that the list of names of those from which petit jurors are selected is segregated in any manner; the proof is to the contrary. Furthermore, the names of negroes and white persons

---

6. A system of jury selection the court said had been condemned by the Court of Appeals in a prior appeal of the same case, Whitus v. Balkcom, 5 Cir., 333 F.2d 496.

were in the several township boxes in proper proportion, and in the light of this record, the single fact that in this one instance the name of only one negro, an alternate, was drawn to serve on the December term jury does not, even under defendant's theory, show purposeful discrimination.

■ Defendant's next point is that the court erred in refusing to grant a new trial on the grounds that he has (1) newly discovered evidence, and (2) a newly discovered witness. He asserts that the newly discovered evidence would corroborate defendant's testimony that it was not his friend, Hutt, who was going from door to door trying to get help for himself immediately after the stabbing, but that it was he (defendant) who was trying to get help for Hutt. He does not state in his unverified motion for new trial or in this point who the witness is who would furnish this evidence, but we infer from his next point that it is Dr. Walter Price of Jefferson City.

The motion does not prove itself. Defendant offered no proof in support of the allegations of the motion. The motion was not accompanied by the affidavit of the witness by whom he would seek to prove the alleged newly discovered evidence, a particular essential required in support of his allegations. State v. Walker, 232 Mo. 252, 134 S.W. 516, 518 [4]. Nor did he make other essential allegations in his motion required of one seeking a new trial on the ground of newly discovered evidence. See: State v. Stapleton, Mo., 368 S.W.2d 395, 398 [5] and cases cited.

■ His next point is that the court erred in refusing to grant a new trial on his ground that the state had not revealed to him that it had taken a statement from Dr. Walter Price favorable to defendant; that this statement was favorable to defendant in that Dr. Price stated therein that defendant had in fact called to him for help for Hutt after the stabbing and that defendant had offered help to Hutt in Dr. Price's presence.

There is no merit in this point for these reasons. First, there is no proof, by affidavit of the alleged witness or otherwise, that the state had taken a statement from Dr. Price, or, if a written statement existed, that defendant had requested a copy thereof. Second, defendant subpoenaed Dr. Price and (according to the allegations of his after trial motion and his assertions in argument of this point) knew before trial as much as or more than the state as to what the Doctor's testimony would be. Thus, this is not a case involving the withholding or suppression of evidence by the state favorable to defendant, but unknown to him, as was the situation in State v. Thompson, Mo., 396 S.W.2d 697, cited as defendant's sole authority in support of this point. Third, there is no proof that Dr. Price was unavailable to testify at the trial, as alleged by defendant in his motion. Furthermore, if the Doctor would so testify but was unavailable and defendant desired his testimony on this collateral issue he should have sought a continuance until the testimony could be secured; instead, he announced ready for trial knowing the circumstances on which he bases this assignment in his after trial motion.

■ We quote defendant's next point: "That the State exhibited the personal effects of the deceased to the jury but did not exhibit the personal effects of the defendant which it possessed and which if exhibited would have shown that neither the defendant or injured Hutt were carrying a razor, but withheld this favorable evidence from the jury and the defendant."

We are not sure that we understand defendant's point. But, whatever he means by the point, we note that he does not charge the court with error in any respect. There was no contention at any point in the trial that defendant was or was not carrying a razor and we fail to see what bearing the fact that he did not possess a razor would

have on any issue. It was conceded that deceased was not carrying a razor and we fail to see how further proof of this fact would be favorable or beneficial to defendant. There is no substance or merit in the point.

 Defendant's next point is that counsel for the state at the close of his argument accused defendant of lying five times during his testimony and that this argument was so inflammatory and prejudicial to defendant that a new trial is required. There was no objection to this argument by defendant; the point is not preserved for review. Moreover, we have read the argument and fail to see wherein it was inflammatory or prejudicial.

 Defendant's next point is that the court erred in propounding certain questions to witnesses for the state. He contends that the court thereby improperly assisted the state in making a case and that the questions asked amounted to prejudicial comments on the evidence.

Defendant refers to two instances of the court asking questions of a witness. The first was during the direct examination of Dr. Fred P. Handler who performed an autopsy on the body of Hutt. Dr. Handler described the stab wound on the left side of deceased's chest. The Doctor was handed what was identified as the knife used in the stabbing and asked whether it was long enough and wide enough to inflict the wound he had described. He said it was. The court asked: "Is it sharp, Doctor?" The doctor answered that it was not sharp now because someone had put scotch tape over the edge. The next instance was during the direct examination of officer Bob Roark. Officer Roark testified that he removed Hutt's undershirt and observed a cut in the shirt, a stab wound in the chest, and the bloody condition of Hutt and the shirt. During a description of these observations, the court asked officer Roark these questions: (1) "Did this undershirt cover his body where you observed the stab wound?" and (2) "Was the wound bleeding?" The answers to both were: "Yes, sir."

This court said in State v. Grant, Mo., 394 S.W.2d 285, at l.c. 287: "One of the well-recognized powers of the judicial function is the right and duty of the trial judge to propound additional questions to witnesses in order to develop the truth more fully and to clarify the testimony given. State v. James, Mo., 321 S.W.2d 698, 704 [2]; City of St. Louis v. Hellscher, 295 Mo. 293, 242 S.W. 652, 653 [4]. In the absence of a showing that the trial judge's interrogation constituted an abuse of discretion and thereby deprived the defendant of a fair trial, prejudicial error has not been demonstrated. State v. Ross, Mo., 371 S.W.2d 224, 228 [6]; State v. Brotherton, Mo., 266 S.W.2d 712, 716–717 [7]; Woodring v. United States, 8 Cir., 311 F.2d 417, 420 [1–2], cert. den. 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414."

This brief examination by the court of these two witnesses was conducted in a fair and impartial manner for the single purpose of clarifying testimony already given and did not constitute an abuse of the court's prerogative and discretion. The questions asked did not assist the state in making a case; nor did they constitute a comment on the evidence.

 The last point briefed by defendant is: "That the reasons set out in Defendant's Motion for New Trial, 1–15, inclusive, herein incorporated by reference, when taken separately, in part, or as a whole raise points which show prejudicial errors were committed which will not let the verdict of the jury stand. The verdict and judgment should be set aside and vacated and the defendant granted a new trial." Those assignments of error in his motion for new trial not briefed are deemed to be abandoned. Sup.Ct.Rule 28.02, V.A.M.R. We have considered and discussed each point briefed and found no error; hence,

the assignments of error briefed do not collectively constitute error.

Our examination of other matters we review under Rule 28.02, V.A.M.R., discloses no error.

The judgment is affirmed.

All concur.