STATE of Missouri, Respondent,

v.

Tom TAYLOR, Appellant.

No. 55450.

Supreme Court of Missouri,
Division No. 2.

Oct. 11, 1971.

Motion for Rehearing or for Transfer
to Court En Banc Denied
Nov. 8, 1971.

John C. Danforth, Atty. Gen., G. Michael O'Neal, Asst. Atty. Gen., Jefferson City, for respondent.

Alan G. Kimbrell, St. Louis County Public Defender's Office, Clayton, for appellant.

HENRY I. EAGER, Special Commissioner.

Defendant was convicted of the forcible rape of a sixteen-year-old girl and, with proof of prior convictions, was sentenced to a term of 20 years. He was represented by counsel of his own choice. Motion for new trial was overruled; the notice of appeal was filed late, but this Court granted leave to file a late appeal. The case is here on a voluminous transcript furnished to him as a poor person.

The sufficiency of the evidence is not attacked, although counsel, throughout the brief, disparages the definiteness of the identification testimony. The name of the victim was necessarily disclosed at the trial; we prefer merely to call her Margaret. She lived in Crestwood, St. Louis County, and attended Lindbergh High School. On the evening of September 13, 1968, she had attended a water polo game at the school, and had then spent some time with two or three girl friends. She was on her way home and within about two blocks of it at approximately 12:30 a. m. on September 14, when a car containing two Negro men crowded her white Volkswagen to the curb; the men jumped out and one was wearing a cap which looked like a policeman's cap; they opened her door, one put his hand around her throat, they pulled her out of her car, slapped her across the mouth and pushed her into the back seat of their car. She screamed whenever the grip was loosened; she had marks on her throat for two months. Her screams were heard by a baby-sitter nearby, the police were notified, and an emergency call went out to all neighboring police. The man who was later identified as the defendant rode on the back seat and slapped the girl or "beat me down" whenever she tried to do anything. The driver was a larger man, taller and fat. The man in the back gave all the driving directions and they drove to the location of a very large construction project where Interstate Highway I–44 was being built, with grading, bridges, overpasses, etc. This project was perhaps two miles long and included the area around Holmes and Big Bend. The car was driven into a secluded spot down a bulldozer trail running off of Holmes Street, and was stopped in a brushy and wooded area. We shall omit the grisly details of the rape; both men forcibly raped the girl on the back seat of the car after threatening to use a knife; the one in the back (identifed later as the defendant) performed the act first. The evidence was fully sufficient to establish a completed act of forcible rape by both men. When these men attempted to leave, the car was found to be stuck in the mud. They worked to free it for approximately 45 minutes; during part of this time the smaller man was in the driver's seat and Margaret observed him there. The place was admittedly dark, but there were a "few lights" in the background. Finally, at 2:06 a. m. the driver of a searching police car saw a glint from the bumper and drove into this track or pathway. Margaret ran to the car crying "Help me please, I've been raped." Other cars came almost immediately upon the report of the first car. The two men ran off into the brush and were not found, although an extensive search was made.

The car in which Margaret had been raped was a dark blue Buick Electra 1965, license number XG–6639; the right rear of the car was up on a jack when the police arrrived; the trunk was open and the car keys in the trunk lock. Three envelopes and a letter were found in the trunk, all addressed to Mr. Tom Taylor, 4417 Garfield Street; also a carbon copy of an auto repair bill addressed to and supposedly signed by Tom Taylor, which also contained the above license number (except that one digit was not clear). An "8 point" blue cap was found in the car, similar to the one which one of the men was wearing. Photographs were taken of the car in its position. No identifiable fingerprints were

found. The articles and papers taken from the car were identified, preserved, offered and received in evidence at the trial.

Margaret testified that she had never had intercourse before. Her family doctor testified that she had a recent tear or laceration of the hymen, a bruise in that area, and that she was still bleeding slightly when examined about noon of that day; also, that she had a bruise on her lower lip. The defendant, Tom Taylor, had worked on this particular construction project since April 1968, and at various places on it; he was generally familiar with the location. He had been released from the penitentiary in March 1968 (according to his own testimony), after serving parts of three seventeen-year concurrent sentences for robberies.

Police officers, including Sgt. O'Keefe, went to 4417 Garfield, were met by a woman and learned from her that Tom Taylor no longer lived there. They then went to 4822A Leduc (all in the City of St. Louis) and were admitted to the upstairs apartment by a woman who identified herself as Mattie Taylor, the wife of Tom Taylor. This was at 6:30–7:00 a. m. In rebuttal, and after Mattie Taylor testified, Sgt. O'Keefe testified that she told them on this occasion, referring to her husband: "He's out, and he better not be with another woman," that they had recently been married, that he left home about ten or eleven p. m. on the previous evening, and that she did not know where he was. The officers noted that a double bed in the next room appeared to have been slept in only on one side, i. e., covers were intact on one side and pulled down and disturbed on the other. This evidence was offered by way of impeachment. The officers returned at about 8:30 a. m., found defendant at home, and took him to the Kirkwood *Police Station. There Sgt. O'Keefe, in the* presence of Detective Bossler, had defendant read aloud the Miranda warnings from a card, and then read them aloud *to* him; O'Keefe asked defendant if he understood them and he said that he did. O'Keefe further testified: that defendant stated that he did not wish an "attorney present at the time"; that he also said he did not wish to make a statement, but that he did relate various events of the previous evening as described in more detail later. Thereupon he was "booked." Early in the afternoon Margaret and her parents were called to the station to view a lineup in which defendant and two other Negroes (all in "casual" clothes or work clothes) within a reasonable approximation of his size and height were displayed. Sgt. O'Keefe testified that just before the lineup he again told defendant that he was entitled to have an attorney present if he wanted one, but that defendant said he did not wish one. O'Keefe talked with Margaret and her parents before the lineup, but showed no photographs, gave her no names and merely explained the procedure to them. Margaret never saw a picture of this defendant until she saw one in the newspaper the next day. She testified that she recognized "the smaller man from the back seat" and told Sgt. O'Keefe "that that was the one." In the lineup defendant seems to have been initially in the center; referring again to Margaret's testimony, she testified (in addition to those facts concerning her abduction, rape and occurrences immediately thereafter, as already related): that "one man caught my eye right away, you know, and I thought that was the man who had been with me the night before * * *"; that, however, she looked at the others to see if she could also identify the driver; that she asked O'Keefe to have the men move and speak; that after a few minutes she told him that she recognized the man "whom she had seen at first," i. e., the "first man that I had recognized," and she told him which one. That man was the defendant. Margaret further testified on cross-examination that her eyes immediately centered on that man, and that her hesitation was in connection with a further identification of the driver. He was the "smaller man from the back seat," and he was this defendant. On cross-examination she also testified that she recognized one

man right away, and then passed on to the others. When asked at the trial (seven months later), she not having seen defendant in the meantime, if she saw the defendant in Court, she said: "I think so, behind the other attorney" and pointed to him saying: "This man here, I guess." When asked on cross-examination about the remark, "I think so," she said there was no question in her mind that the defendant present in Court was the man she had identified, and also that she was "fairly confident." Margaret was never shown a photograph of defendant. At some time before this, but long after the lineup, she picked out one photograph from a group which she thought "could" have been the driver (the larger man), but it was not one "Mimms" who will be referred to later.

Prior to trial a motion was filed to suppress the identification evidence. It was heard twice (why twice we do not know) by two different judges, with extensive evidence, and overruled. That question is not pursued as a point in the present brief, although counsel repeatedly refers to the subject. We do not refer to the evidence on the motion. The Court received evidence of two first degree robbery convictions of defendant and of his imprisonment therefor, and made a finding thereon. The superintendent of the I–44 project testified that the only car he recalled seeing defendant drive to and from work was a "dark blue Electra Buick." The contractor had at least one guard on the project at night.

Defendant and his wife testified. She testified, in substance: that in September 1968, defendant was driving a borrowed car; that on the evening of September 13, 1968, she and defendant drove to dinner at McDonald's and returned home around 8:00 p. m.; that defendant then left to report to Mr. Wrenthrope, the man he had borrowed the car from, and returned about 11:00 p. m.; that they both were then at home until around 6:00 a. m. the next morning when he again left to see Mr. Wrenthrope, returning about 8:00 a. m.; that defendant was using on this car the li-

cense plate from her Chevrolet. With reference to the first visit of the officers she testified: that she told them her husband would be back "in a few minutes"; that she did not tell them that he had been out all night, or that she did not know where he was or where he had been all night; that she did say that her car was in the shop.

The defendant testified, in substance: that he started to work on the I–44 project in April 1968; that between 1950 or 1953 and 1960 he had been convicted five times, twice for burglary and three times for armed robbery (on which he received seventeen-year concurrent sentences); that he got out on parole in March 1968; that he bought a car but it burned, and he had borrowed the Buick Electra from a Mr. Wrenthrope who ran a repair shop; that the latter had done work on the car and was holding it for payment, but loaned it to Taylor for some undefined amount of compensation; that he reported back to Wrenthrope from time to time to see if he wanted the car back; that he had switched the license plates from his wife's Chevrolet to the Buick, although he knew that this was illegal; that he had worked all up and down through the area where (from a photograph) the rape had occurred; that he recognized the envelopes, letter and bill taken by the police from the trunk of the Buick; that he drove the Buick to work on September 13, and on that evening used it to drive his wife out to dinner, getting home about 8:00 o'clock; that he then went out to check with Mr. Wrenthrope, looking first at his garage; that Wrenthrope was not there, so he went to a vaguely described place at 2500 Mullanphy which Wrenthrope frequented, and parked his car there, *leaving the keys in the ignition;* he described the place as a "shake-them-up house" where people play cards and shoot dice, etc.; the fair inference is that the place was a gambling house. He did not find Wrenthrope, but stayed there "25 to 35 minutes." He further testified: that when he left that house his car was gone, so he walked back to Wren-

thrope's garage, but finding it closed, he went home arriving about 11:00 p. m. or a little before; that he stayed at home until about 6:00 a. m. when he got up and went out again looking for Wrenthrope; that he did not find him, and came home; that the police arrived within a few minutes; that they asked if he would mind "talking to them" and he said "no," and left with him; that he was taken to the Kirkwood station; that Sgt. O'Keefe asked him where he was "last night" and he told him the same things which he had just testified to, and which we have just related; that he had driven the Buick but "not out in the County" (this was all brought out in his direct examination); that he did not report the theft of the car because he knew the switching of the license plates was illegal, and he was on parole; that O'Keefe told him that he was charged with rape; that he made no more statements after that. On cross-examination he testified: that he always left his keys in the car when at work because it sometimes had to be moved. In rebuttal Sgt. O'Keefe gave the testimony as to what Mattie Taylor had told them when they went to the home the first time; this was offered and received by way of impeachment of her testimony. We have already related this. "Mr. Wrenthrope" did not appear or testify. Defendant did not, at the trial, deny that he had been given a full warning of his constitutional rights. In fact, he reaffirmed the making of certain statements to the officers on his direct examination, and thus did so voluntarily.

Defendant filed motions for acquittal at the close of the State's case and at the close of all the testimony. Both were overruled. The point is not briefed here. The jury considered the case for nearly three hours and its members were polled when the verdict was returned. Prior to the sentencing defendant "dismissed" his employed attorney and requested the appointment of the public defender. An order was made accordingly.

Since defendant asks that we consider four of his six points upon the theory of plain error, we shall review very briefly the status of that principle. The Rule, 27.20(c) of our Criminal Rules, V.A.M.R., provides that: "Plain errors affecting substantial rights may be considered * * * though not raised in the trial court or preserved for review, * * * when the court deems that manifest injustice or miscarriage of justice has resulted therefrom."

In State v. Patterson, Banc, Mo., 443 S.W.2d 104 (1969), where the alleged error was the failure to give an instruction requested by the defendant, the Court held that it would consider, on a case-to-case basis, whether "manifest injustice or miscarriage of justice" had resulted. It held there that it had not, although the instruction should have been given. To the same general effect, see Burrell v. Mayfair-Lennox Hotels, Inc., Mo., 442 S.W.2d 47, and State v. Ellifrits, Mo., 459 S.W.2d 293.

The first point raised by defendant on this theory is that it was error for the Court to permit Sgt. O'Keefe to testify that defendant said that he did not wish to make a statement. Since defendant contends that this violated his constitutional right to remain silent, we shall consider the contention, but this does not mean that it constitutes plain error. The witness testified: that he took defendant to the police station on the morning of September 14, 1968; that he advised him fully of his rights under the Miranda case (explaining in detail how this was done); that defendant said that he did not wish an attorney present and, when asked if he wished to make a statement, "stated he did not." However, defendant did proceed at that time to tell in considerable detail what he had done on the evening before. In substance, this was: that he had taken his wife out to dinner, that they drove to the restaurant in a blue 1965 Buick Electra 225 four-door hardtop with license number XG–6639 which had been issued to his wife under the name of Mattie Gilbert (her previous name), and that he had been married to her in July; that they returned home, and that he went out again shortly thereafter. No point is

made here on the admission of those statements. The record at this point is confused by almost incessant objections by defense counsel to questions as leading, or as too specific or too general (none of which are now preserved) and by some rather peculiar rulings of the trial court thereon, so that the sequence of the events is obscure. However, it is clear that defendant, at almost the same time that he declined to make a statement, actually proceeded to make one; this statement, in fact, corroborated his later testimony, so far as it went. The jury could not reasonably have inferred, in view of all this, that he was hiding his guilt by the remark that he did not wish to make a statement. That is the primary reason for refusing such statements.

■ Ordinarily, the refusal of one in custody to make a statement cannot be used against him. Defendant concedes that this objection was not made or preserved, and raises the point under the doctrine of plain error. The cases he cites do not apply to this situation. In State v. Phelps, Mo., 384 S.W.2d 616, State v. Dowling, 348 Mo. 589, 154 S.W.2d 749, and State v. Vainikos, Mo., 366 S.W.2d 423 there were either objections or motions to strike. In State v. Yager, Mo., 416 S.W.2d 170, the Court felt that the failure to object to such testimony was a matter of trial strategy and that the admission of the evidence was not plain error. The other cases cited do not help defendant. In State v. Martin, Mo., 433 S.W.2d 565, the evidence of a defendant's denial of all knowledge of the crime (without warnings) was held not to be plain error, since, in fact, it was merely corroborative of his testimony at trial. In none of the cases did the defendant proceed at the time to make a statement, in whole or in part.

■ In this case there was substantial evidence that defendant had been fully warned of his constitutional rights. While he did supposedly say that he did not wish to make a statement he proceeded, in almost the same breath, to make statements which, so far as they went, were fully corroboratory of his testimony at the trial. Under these circumstances it is obvious that the remark that he did not wish to make a statement could not have contributed to his conviction, nor did it, in any event, result in "manifest injustice or a miscarriage of justice." The point is denied.

Next, counsel says that the Court erred in refusing to give the following Instruction (E), offered by defendant: "You are further instructed that testimony tending to prove identity is to be scrutinized with extreme care. In considering such testimony you must take in account the opportunity of the witness to observe, the description given by the witness, and the positiveness of the identification at trial." The Court had given the usual instructions dealing with the presumption of innocence and requiring evidence proving the guilt of the defendant beyond a reasonable doubt; in fact, in Instruction No. 2 the latter requirement (reasonable doubt) was referred to three times. Such was again referred to in a given alibi instruction. Defendant's argument is based upon the supposed lack of definite identification of defendant by the victim, the supposedly slight opportunity she had to observe the men because of darkness, etc., and the rather sketchy descriptions given by her to police. Defendant does not rely upon Missouri authorities, except to make attempted distinctions of the cases of State v. Smith, 358 Mo. 1, 212 S.W.2d 787, State v. Bibbs, Mo., 461 S.W.2d 755, and State v. Abbott, Mo., 265 S.W.2d 316. There is nothing in any of those cases which supports defendant's contention. In fact, in Bibbs, the means of identity was the very brief view the police had of the defendant at night from their car with "flasher lights," while defendant was in the car ahead shooting at them through its rear window. The Court gave two instructions offered by defendant dealing with reasonable doubt which might be considered as converses. It refused four instructions commenting on the evi-

dence and cautioning the jury regarding identity testimony. The Court held that *upon that evidence* no such instructions were necessary and that in any event the giving or refusal of cautionary instructions is discretionary with the trial court.

■ Counsel has cited thirty cases from other states and nine Federal cases, as supposedly supporting his argument. We have examined some of them, but we are not persuaded that we should alter our rule. The trial court was not in error because (1) the giving of such a cautionary instruction was purely discretionary; and (2) under this evidence the Court certainly did not abuse its discretion. We shall not repeat the evidence which we have already outlined, but we do note the rather positive corroborating circumstantial evidence of the envelopes, letter and bill in the car leading directly to the defendant, and the positive identification of defendant at the lineup. The girl's slight hesitancy at the trial, when she had not seen the defendant for seven months, is understandable; she had tried to forget the whole affair; she was sixteen when the offense was committed, seventeen at trial; she would normally not be too assertive or aggressive, but her testimony at trial, fairly considered, was also a fair identification of the defendant. Her opportunity to observe the defendant was no less than that considered sufficient in Bibbs, supra. She was with these men for an hour and a half, and at some time she certainly would have been able to see defendant sufficiently for purposes of identification. The defendant was directly connected with the crime by the circumstantial evidence unless the jury chose to believe his story about the theft of his car with the keys left in it; very obviously it did not do so.

Such instructions as this one are certainly comments and arguments upon the evidence (Smith, supra,) and upon one particular part of the evidence; Instruction E would have almost *told* the jury to disregard the girl's testimony on identification.

The jury had been told (three or four times) that it must find, beyond a reasonable doubt, that *this defendant* committed the crime; a suitable alibi instruction had also been given. The refusal of the instruction did not constitute error.

■ In the next point defendant again raises "plain error" in the admission of certain statements made by defendant to Sgt. O'Keefe. These have already been recited, but briefly they consisted of a statement of his activities on the evening of September 13, until he got home from dinner about 8:00 p. m., including the fact that soon thereafter he "went out." They did not contain his story about the theft of the car. There was ample evidence of Miranda warnings, and no valid objections at trial to the evidence. At the trial defendant did not deny the Miranda warnings, and he testified, *voluntarily* to all the same facts (including the use of the Buick car) and to certain additional facts which constituted his alibi, essentially that the car had been stolen and that he was at home at the time of the offense. Thus, defendant admitted before the jury all the facts which he now says were illegally shown in the State's evidence. Under these circumstances, there is no constitutional error (State v. McGee, Banc, Mo., 447 S.W.2d 270), and no possibility that the admission of his statement constituted "manifest injustice or a miscarriage of justice," or that the admission of the evidence contributed to defendant's conviction. There was no "plain error," and the contention is denied.

■ Defendant next complains that the Court erred in sustaining the State's objection to a question asking Sgt. O'Keefe if he conducted any investigation "with respect to Charles Lee Mimms." As indicated by an offer of proof, the theory of defendant's counsel was that an investigation followed the identification by Margaret of a photograph of Mimms as the driver of the car, and that it was found later that Mimms was in the penitentiary at the time of the offense. The testimony

of Sgt. O'Keefe was that Margaret did *not* identify any photograph of Mimms, and she testified that she did not think she had done so. There was no evidence to show that she had. The question was irrelevant since it was not based upon any evidence then or thereafter in the case, and it concerned a purely collateral matter. Indeed, the whole idea, dragged into the case from time to time as it was, became a "red herring" with a strong tendency to confuse and mislead the jury. The Court properly sustained the objection to the proffered question and the offer of proof.

■ Coming back to the "plain error" theory, defendant next asserts that the admission of evidence that the officers went to defendant's home at 4822A Leduc, after talking to a woman at 4417 Garfield, constituted a showing of actions based on hearsay and was "plain error." The doctrine of plain error is not intended to cover ordinary trial errors, such as the admission or exclusion of evidence where there has been no objection and no assignment in a motion for new trial, unless the error (if any) results in "manifest injustice or a miscarriage of justice." State v. Patterson, supra.

■ The evidence here merely was that the officers went to the address of Tom Taylor as shown on the papers taken from the Buick car, that they were met there by a woman who told them that he no longer lived there, and that they then proceeded to the other address. Defendant complains of the inference that the woman told the officers that Taylor had moved to 4822A Leduc. The result was merely that the officers located Taylor, not that any incriminating information was given or any incriminating inference raised. In State v. Chernick, Mo., 280 S.W.2d 56, cited by defendant, the testimony in question and the arguments based thereon were specifically objected to and, moreover, the

inference reasonably to be drawn from the indirect hearsay was necessarily one of the defendant's *guilt*. Plain error was not even considered. The case is in no way persuasive here. Clearly, the admission of hearsay evidence, unobjected to, is ordinarily no ground for reversal. State v. Willis, Mo., 283 S.W.2d 534. It would be wholly illogical to hold that an inference, based on hearsay, which merely resulted in locating the defendant, caused "manifest injustice or miscarriage of justice," and we decline to so hold. The point is denied.

■ The last point is again one of supposed "plain error" in failing to give an instruction cautioning the jury concerning Sgt. O'Keefe's rebuttal testimony; this was offered as impeachment of the testimony of Mattie Taylor. She had testified that defendant was at home from about 11:00 p. m. to 6:00 a. m. on the night in question. Sgt. O'Keefe, in rebuttal, testified to the statements she had made to him and the other officers on their first call at the home on the mornng of September 14; these statements directly contradicted her testimony. They are fully related above. Though defendant offered no limiting instruction, counsel now says that the Court, of its own motion, should have given one restricting the use of O'Keefe's testimony to a consideration of Mattie Taylor's credibility; counsel also says that the circuit attorney commented in argument on this divergence in testimony. That argument may be considered as one upon Mattie Taylor's credibility. Counsel cites the case of State v. Chaney, Banc, Mo., 349 S.W.2d 238, but his only contention is that we should follow the separate opinion of Judge Storckman concurring in the result. It has been substantially impossible to rely upon the Chaney case as authoritatively supporting any view. Two Judges concurred in Judge Hyde's opinion, one, in addition to Judge Storckman, concurred in the result, but not in Judge Storckman's

**404**

opinion. The writer and Judge Leedy dissented. Judge Hyde held that a *proffered* instruction on the effect of impeaching evidence was erroneous, but that the Court should have corrected it (or prepared a new one) and given it as one upon a collateral matter. He further held that upon collateral matters an instruction embodying the principle asserted *must be offered* in order to charge the Court with error. Judge Storckman apparently held (for himself only) that such an instruction should have been given as a part of the law of the case. Certainly, the majority of the Court did not hold that an instruction limiting the effect of impeachment testimony must be given where none is offered, correct or incorrect. And see, generally, State v. Kelley, Mo., 442 S.W.2d 539. The case does not support defendant's position here. Moreover, in Chaney, the Court was not even considering any question of "plain error." We are not cited to any case holding that it would have been even ordinary error for the Court to fail to give an instruction on this subject if one was not offered,—i. e., if such a contention had been specifically included in the motion for new trial. In such a situation the failure certainly could not be available as "plain error." And if more is needed, we see no "manifest injustice or miscarriage of justice" resulting.

We have discussed all of defendant's points. His appointed counsel has vigorously and very competently represented him here.

The judgment is affirmed.

PER CURIAM.

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.