**STATE of Missouri, Plaintiff-Respondent,**

v.

**Virgil HALK, Defendant-Appellant.**

**No. 35919.**

Missouri Court of Appeals,
St. Louis District,
Division Three.

April 29, 1975.

Motion for Rehearing or Transfer
to Supreme Court Denied
June 12, 1975.

Charles D. Kitchin, Public Defender, Richard A. Knutson, David V. Uthoff, Asst. Public Defenders, St. Louis, for defendant-appellant.

John C. Danforth, Atty. Gen., and K. Preston Dean, II, Asst. Atty. Gen., Jefferson City, Brendan Ryan, Circuit Atty. and Thomas J. Kavanaugh, Jr., Asst. Circuit Atty., Charles B. Blackmar, Sp. Asst. Atty. Gen., St. Louis, for plaintiff-respondent.

SIMEONE, Presiding Judge.

Defendant-appellant, Virgil Halk was convicted of the offense of attempted burglary and was sentenced to five years in the Department of Corrections. §§ 556.150, 560.040, RSMo 1969, V.A.M.S. He appeals. We affirm the judgment of conviction.

Mr. and Mrs. Jack Alumbaugh on May 9, 1973, owned a residence at 6128 Westminster Avenue in the City of St. Louis. To the west next door is a residence owned by Dr. Orland W. Johnson. There is a "gangway" between the two residences. On the morning of May 9, 1973, Mr. and Mrs. Alumbaugh left their home about 8:00 a. m. The doors and windows were locked. They did not give permission to anyone to enter their home that day.

At about 9:00 a. m. Mrs. Cheryl McKee, who lived a few doors away from the Alumbaughs, was taking her daughter to school and had occasion to walk by the Alumbaugh home. When she arrived at the gangway between the two homes, she "observed two young men kneeling in the gangway in front of the [basement] window, and one young man was pushing on the window." One of the men she saw kneeling and pushing on one of the windows in the Alumbaughs' residence was the defendant, Virgil Halk. When she saw the young men in the gangway, she said, "What the hell are you doing there?" and when she made the statement, "[t]hey turned and looked at me and then turned and jumped the fence into Dr. Johnson's back yard." At about that time, Dr. Johnson had just come back from walking his dog, and Mrs. McKee told him that "something was going on there." Dr. Johnson went through his house and out to the back yard to "see if anybody was around." About forty-five minutes or an hour later, he went to the back alley because "I thought I had seen some people pass down the alley. . . ." When he started back toward his house, he was aware of a man standing by the gate. "He would be looking down at the Alumbaughs' window or just standing there. And at that point he turned around and saw me, and then evidently there had been two other people there also, and they got up and ran, and then the other person also ran." He could not identify the defendant, but Mrs. McKee did. Mrs. McKee knew the defendant because he "lives on Westminster." She was able to identify the defendant in a lineup consisting of four men who were "all approximately the same physical description . . . [h]eight, weight, build, and so forth."

After Dr. Johnson saw the young men run down the gangway toward the street, he called the police and gave them a general description of the young men. The police and Dr. Johnson examined the Alumbaugh window; the "bars had been more or less torn loose from the window sash."

About 10:30 a. m. Mr. Alumbaugh, after receiving a phone message, returned to his home. When he arrived, he found that there "was an ornamental iron grille removed from one of the basement windows, placed against the foundation, and the window was pushed in. It is a swinging-type window."

When Dr. Johnson called the police, Patrolman Jerry Jones came to the scene. He spoke with Dr. Johnson and noticed the condition of the basement window. "When I arrived, the iron bar . . . was on the outside, leaning up against the building."

Virgil Halk was arrested by Officer Frank Banaszek, on May 9, at the defendant's residence. Eventually trial was held. At trial, the prosecutor inquired of Officer Banaszek—"After the defendant was placed under arrest, was he advised by you or anyone in your presence of his constitutional rights?" He replied, "Yes, sir. I gave him his rights." The officer also told the defendant he did not have to make a statement, that anything he said could and would be used against him. During the trial, the prosecutor again inquired of the officer—"[after the lineup at the district station] Did you again advise the man of his rights that he had a right to remain silent and didn't have to make a statement?" The officer replied, "I'm not sure. We didn't question him. He refused to make a statement." (*Emphasis added*). No objection was interposed, nor was any motion to disregard or motion for mistrial made.

Defendant made a motion for judgment of acquittal at the close of the state's case and again at the close of all the evidence. The defendant did not testify.

After instructions were given, which did not include one on "mere presence," the jury returned a unanimous verdict of guilty. Defendant filed a motion for new

trial alleging error in that the court erred in (1) "allowing Patrolman Frank Banaszek to comment on the fact that Virgil Hack (sic) did not make a statement" and (2) "not instructing the jury on the law as to mere presence of an individual at the scene of an offense." After the motion was overruled, the defendant was sentenced to five years.

On this appeal, defendant urges three grounds for reversal: (1) "The trial court erred in permitting testimony concerning defendant's refusal to make .a statement since such evidence constituted an infringement on defendant's constitutional rights"; (2) "[t]he court erred in not instructing the jury on mere presence of defendant at the scene of the crime, since it involved a question of law which was necessary information for the jury in reaching a verdict"; and (3) "[t]he trial court erred in overruling defendant's Motion for a Directed Verdict since there was not substantial evidence of appellant's guilt and a cause of action was not sufficiently established."

We shall determine these points in inverse order. In ruling on the sufficiency of the evidence to sustain a conviction, we consider the evidence in the light most favorable to the state and all favorable inferences reasonably drawn therefrom as true, and all evidence to the contrary is to be disregarded. State v. Favell, 411 S.W.2d 245, 247 (Mo.App.1967); State v. Murphy, 356 Mo. 110, 201 S.W.2d 280, 282 (banc 1947); State v. Cain, 507 S.W.2d 437, 438 (Mo.App.1974).

■ There is no merit to the defendant's third contention, and the authorities relied upon are not dispositive of the issue here. The defendant correctly states the general principle that evidence that an accused had an opportunity to commit an offense which merely raises a suspicion of guilt and gives rise to conjecture is insufficient to support a conviction. State v. Cain, supra, 507 S.W.2d at 440. Mere presence of an accused at the commission of an offense, while it is evidence to be considered in determining guilt, is insufficient unless there is evidence that the defendant participated in the commission of the offense or associated himself in some way with the venture. State v. Castaldi, 386 S.W.2d 392, 395 (Mo.1965); State v. Cain, supra, 507 S.W.2d at 441. There is evidence here that the defendant actively participated in the offense. The defendant and others were seen in the gangway kneeling by the Alumbaugh window, the defendant was identified by an eye witness pushing on the basement window and the grille was found lying next to the window against the foundation. We conclude that there was sufficient evidence to make a submissible case.

■ As to the second point, the court gave an instruction that "[a]ll persons are equally guilty who acts [sic] together with a common intent in the commission of a crime and a crime committed by two or more persons acting jointly is the act of all and each, one so acting." Defendant contends that this "instruction is to [sic] general and inadequate because it omits a necessary area of the law, namely it makes no mention or explanation of mere presence of an accused at the scene of the offense." He further contends that a "mere presence" instruction should have been given because this involves a question of law.

Appellant relies upon State v. Schleicher, 458 S.W.2d 351 (Mo. banc 1970). That decision held that the omission of the words "before or during the commission thereof [the crime]" did not make the instruction given inadequate since the instruction adequately required the presence and assistance in the criminal act itself. 458 S.W.2d at 354–355. That decision is not, we believe, authority for the point raised by appellant. The trial court in this case gave an instruction which required the jury to find beyond a reasonable doubt that if the defendant, acting alone or with others, did, with felonious intent, attempt to break and enter the Alumbaugh home and that de-

fendant failed in the actual perpetration of the burglary, then the jury should find defendant guilty of attempted burglary in the second degree.

The evidence was that Mrs. McKee placed the defendant at the scene; she saw the defendant pushing on the window. The instruction given, we believe, adequately required the jury to find that the defendant was present so that an instruction on presence was not necessary. The trial court did not err in failing to give an instruction on "mere presence." No such instruction was requested, and we believe that presence is a fact rather than a matter of law.

Thirdly, defendant makes much of the statement by Officer Banaszek that ". . . We didn't question him. He refused to make a statement." Defendant vigorously contends that the trial court erred in permitting this testimony and that such a comment indicating silence of an accused permits the jury to draw an inference of guilt. He contends that a long list of cases has held that "silence on the part of the accused after arrest or while in custody is inadmissible [sic] because he is under no duty to speak." No objection was made at trial, and the point was not preserved for review; however, he urges us to treat the matter as "plain error" which affects the substantial rights of the defendant. Rule 27.20(c), V.A.M.R.

■ The rule is well established in this state that silence of an accused while under arrest is not admissible against him, because such person is under no duty to speak. State v. Dowling, 348 Mo. 589, 154 S.W.2d 749, 755 (1941); State v. Foley, 144 Mo. 600, 46 S.W. 733, 738 (1898); State v. Allen, 235 S.W.2d 294, 296 (Mo.1950); State v. Vainikos, 366 S.W.2d 423, 427 (Mo. banc 1963); State v. Phelps, 384 S.W.2d 616, 621 (Mo.1964); State v. Stuart, 456 S.W.2d 19, 22 (Mo. banc 1970); State v. Bowdry, 346 Mo. 1090, 145 S.W.2d 127, 130 (1940). The decisions which have applied this rule are cases where the accused was asked about the alleged crime or where someone in the presence of the accused made a statement about the alleged crime. This rule was extended in State v. Stuart, supra, to cover a situation where the defendant under arrest failed to volunteer an exculpatory statement. Such failure to volunteer such a statement was held to be inadmissible as an admission. The parties have not referred us to any decision, and our research discloses none, which resolves the issue presented—whether a statement made by an officer after giving the Miranda rights that the accused "refused" to make a statement—is reversible error regardless of the circumstances.

We believe that in the context of the facts of this case the one statement—"He refused to make a statement"—is not such plain error to require reversal.

■ Rule 27.20(c) provides that plain errors affecting substantial rights may be considered in the discretion of the court though not raised in the trial court or preserved for review "when the court deems that manifest injustice or miscarriage of justice has resulted therefrom." But before the "plain error" rule may be invoked, there must be a sound, substantial manifestation and a strong clear showing that injustice or miscarriage of justice will result if the plain error rule is not invoked. State v. Carpenter, 436 S.W.2d 748, 751 (Mo.1969); State v. Meiers, 412 S.W.2d 478, 480–481 (Mo.1967).

In State v. Meiers, supra, the defendant contended that certain statements made by him at the time of his arrest were admitted when he was not advised of his constitutional rights. The defendant sought review under Rule 27.20(c). Our Supreme Court declined to invoke the plain error rule, since there was no substantial manifestation that injustice or miscarriage of justice would result. See also State v. Taylor, 472 S.W.2d 395, 403–404 (Mo.1971).

The court in *Meiers* declined to adopt a rule where a question of a violation of rights under the Fifth Amendment is

raised, that it must in every case abandon other time-tried and tested reasonable rules of trial and appellate practice. The "plain error rule" is to be invoked only on a case-by-case basis to prevent manifest injustice or miscarriage of justice.

■ We do not perceive any manifest injustice or miscarriage of justice in this case. The six words of the officer do not in our opinion constitute such a miscarriage of justice so as to constitute plain error and so as to require a reversal. The defendant was identified by Mrs. McKee pushing on the basement window, he was known by Mrs. McKee, the state's evidence was substantial, the question propounded to the officer by the prosecutor was not "Did he refuse to make a statement?" but rather "Did you again advise the man of his rights . . . ?" The statement made by the officer was somewhat unresponsive. There was no deliberate attempt by the prosecutor to elicit a reply that the defendant refused to make a statement. The question was not objected to, and no objection was made to the statement. Under these circumstances, therefore, we do not find plain error.

Having disposed of all the contentions raised by the appellant and finding no reversible error, the judgment of conviction is affirmed.

The judgment is affirmed.

GUNN, J., concurs.

McMILLIAN, J., dissents in separate opinion.

McMILLIAN, Judge (dissenting).

I respectfully dissent. While the majority opinion recognized that silence of an accused after arrest and while in custody is not admissible against him because such a person is under no duty to speak, the opinion thereafter does violence to the principle.

In deciding that our "plain error" rule has no application, the majority opinion adopts a very mechanistic formula by at-tempting to measure whether a miscarriage of justice resulted by a mere counting of words.

To put the claimed error in proper context, I have set out in full, relevant parts of the prosecutor's questions:

"Q. After the defendant was placed under arrest, was he advised by you or anyone in your presence of his constitutional rights?

"A. Yes sir. I gave him his rights.

"Q. Did you tell him he did not have to make a statement?

"A. Yes Sir.

"Q. Did you tell him anything he said could be and would be used against him in court?

"A. Yes Sir.

"Q. After you advised him of those rights was he detained by you or was released?

"A. He was placed under arrest by me and conveyed to the 7th District Station.

"Q. After she viewed the lineup at that point, was this man released by you or detained, booked, and forwarded downtown?

"A. Detained and booked and forwarded.

"Q. Did you again advise the man of his rights that he had a right to remain silent and didn't have to make a statement?

"A. I'm not sure. We didn't question him. He refused to make a statement."

We now know from the transcript of the trial that defendant never made a statement. And we may assume that the prosecutor was aware of this fact. Thus, the question becomes what was the motive, or, to say the least, the relevance of the question, "After the defendant was placed under arrest, was he advised by you or anyone in your presence of his constitutional rights?" And the further question, "Did you tell him he did not have to make a statement?" Obviously, neither question

has any relevance nor materiality unless defendant had made an admission and the state was laying the foundation for its admission into evidence. Such was not the case, and as the prosecutor well knew defendant had made no statement. In this posture the motives of the prosecutor become suspect.

Not satisfied with the undue advantage gained from this thrust, the prosecutor continues his deadly attack with the question, "Did you tell him anything he said could be and would be used against him in court?" And finally, "Did you again advise the man of his rights that he had a right to remain silent and didn't have to make a statement?" Answer, "I'm not sure. We didn't question him. He refused to make a statement." In my opinion this entire line of questioning by a seasoned prosecutor was an attempt to convict the defendant by his silence, permitting the jury to draw an inference of guilt from his refusal to explain, in violation of the spirit, if not, the letter of the Fifth Amendment of the United States Constitution and Article I, § 19, Mo.Constitution, V.A.M.S.

In State v. Dowling, 348 Mo. 589, 154 S.W.2d 749, 755[4, 5] (1941), in a well-reasoned opinion by the late Judge Ellison, where an officer was permitted to state that: (1) the accused ". . . 'wasn't going to say anything until he seen an attorney' . . ." and (2) the accused ". . . 'refused to tell us where he had been' . . ." the court held it cannot be proven that the defendant said he declined to answer on the advice of counsel; or refused to give a statement, People v. Rothe, 358 Ill. 52, 192 N.E. 777, 779(7) (1934); or declared he had nothing to say, Diblee v. State, 202 Ind. 571, 177 N.E. 261, 264(8) (1931).

In support of his conclusion Judge Ellison declared, "Section 22, Art. II of our Constitution [the present Art. I, § 18(a), Mo.Constitution, 1945] provides the accused in a criminal case shall have a right to appear and defend in person and by counsel. This applies also to proceedings before the trial.

Section 23 [the present Art. I, § 19, Mo.Constitution, 1945] of the same Article provides no person shall be compelled to testify against himself in a criminal cause. The immunity afforded by this section protects the accused against self-incrimination before any tribunal or in any proceeding. Section 4082, R.S.1939, § 3693 Mo.St.Ann. p. 3247 (now § 546.270, RSMo 1969 [V.A.M.S.]) provides: 'If the accused shall not avail himself or herself of his or her right to testify, . . . it shall not be construed to affect the innocence or guilt of the accused. . . .' "

If these statutory and constitutional rights have any meaning whatsoever their provisions cannot be violated, indirectly or directly, at the trial by a showing that defendant had theretofore been subjected to interrogation and stood on constitutional rights. Here, it is not a question as to whether or not these gratuitous statements were made by the officer inadvertently or were direct answers (as shown here) to inquiries made by the prosecutor, the question is whether or not such comments are constitutionally impermissible. I think so.

In State v. Phelps, 384 S.W.2d 616 (Mo. 1965), the accused did not respond to officers' questions while under arrest for a robbery. The court held that the evidence referred to was not competent, and its admission was error which was prejudicial to the defendant. Evidence that the accused did not respond or make any statement to the police officers while under arrest may well have been considered by the jury in determining his guilt or innocence. In State v. Stuart, 456 S.W.2d 19 (Mo. banc 1970), a juror, without objection, asked a police officer, "Did either one of these guys claim the money?" And the officer answered, ". . . [N]o." The alleged error was neither preserved at trial nor asserted in the motion for a new trial. Relying on "plain error", the court held an accused's failure to volunteer an exculpatory statement is not admissible as an admission, and it may not be shown that by his silence he

failed to deny or explain, while under arrest, any incriminating facts.

In the instant case, on two occasions, these incriminating admissions were placed before the jury, and by his silence or refusal to make a statement, his very refusal may in the mind of the jury be damaging or, to say the least, construed to affect either his innocence or guilt. Consequently, I would reverse and remand for a new trial.