STATE of Missouri,
Plaintiff-Respondent,

v.

David Lewis POGUE,
Defendant-Appellant.

No. 10550.

Missouri Court of Appeals,
Springfield District.

March 8, 1978.

David G. Neal, Eminence, for defendant-appellant.

John D. Ashcroft, Atty. Gen., Neil MacFarlane, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Before STONE, P. J., and HOGAN and FLANIGAN, JJ.

FLANIGAN, Judge.

A jury found defendant David Lewis "Louie" Pogue guilty of manslaughter arising out of the shotgun slaying of his brother-in-law Scott Taylor. Defendant was sentenced to five years' imprisonment and he appeals.

Defendant's first "point relied on" is that his constitutional rights were violated when the prosecuting attorney, during the presentation of the state's evidence, interrogated sheriff Jim Bolin concerning his conversation with defendant and the latter's silence while under arrest at the scene of the shooting shortly after it happened. With commendable candor defendant's brief states that "defense counsel did not properly object and did not properly preserve the matter for appellate review." Defendant urges that he is entitled to relief under the "plain error rule," Rule 27.20(c).[1] After reviewing the whole record in this case this court has determined that manifest injustice has resulted from the alleged error. The point is well taken and requires reversal.

At approximately 7:30 p. m. on June 27, 1976, Jimalee Pogue, wife of the defendant, telephoned sheriff Bolin and told him, "Jim, get over here quick. Somebody has shot Scott Taylor." Bolin, accompanied by police officer Eugene Nichols and deputy sheriff George Stearns, drove immediately to the scene. Upon their arrival approximately five minutes later, the three officers found the victim, Scott Taylor, lying in a ditch about 200 feet from defendant's trailer home. The officers stopped to aid Taylor, who was still alive but mortally wounded. An ambulance arrived "in a few minutes." Before the ambulance arrived Taylor told the officers, "Louie shot me five times." Taylor died in the ambulance before it left the scene.

As a witness for the state, sheriff Bolin testified, on direct examination, that after he had checked the victim's condition, he saw the defendant and his wife "standing up toward the trailer" so Bolin and deputy George Stearns went "up there." The following then occurred:

Q. (By the prosecutor) And what happened up there that you know about?

---

1. Unless otherwise indicated, all references to rules are to Missouri Rules of Court, V.A.M.R., and all references to statutes are to RSMo 1969, V.A.M.S.

A. George got out, he got out before I did and he said something to Louie. I don't know, I can't say what it was, what he said to him. But then whenever I got out, I walked up and told Louie that he was under arrest.

Q. And what did you do then?

A. George handcuffed him and Louie asked me, he said, "Can I get some more clothes?" And I said, "No, but your wife can get them for you."

\* \* \* \* \* \*

Q. And what happened next?

A. *I read him his rights and George or me one asked him what happened and he told me he'd rather not talk about it.*

Q. *Did he explain that at all?*

A. *Sir?*

Q. *Did he explain why he didn't want to talk about it?*

A. *No, he didn't say.*

Q. *Did he make any explanation of the shooting at that time?*

A. *Not—*

MR. NEAL: Objection, Your Honor. This gets into the defendant's rights.

THE COURT: Sustained.

Q. (By the prosecutor) *Did you question Mr. Pogue after giving him the rights other than what you've—*

A. *No. No, I didn't question him anymore.*

\* \* \* \* \* \*

Q. *When you received the call that Scott Taylor had died, did Mr. Pogue make any response?*

A. *He didn't say anything.*

On redirect examination of sheriff Bolin by the prosecutor, the following occurred:

Q. (By the prosecutor) *Did he say anything else other than "I want to talk to a lawyer?"*

A. *Only he said he hoped he didn't die.*

"The law is established in this state that the silence of an accused while under arrest is not admissible against him because he is under no duty to speak. . . . We now hold that an accused's failure to volunteer an exculpatory statement is not admissible as an admission; that it may not be shown that by his silence he failed to deny or explain while under arrest an incriminating fact as to which no question was asked. . . . The admission of such evidence constitutes an invasion of the accused's constitutional rights." *State v. Stuart,* 456 S.W.2d 19, 22[3, 4] (Mo. banc 1970). See also *State v. Benfield,* 522 S.W.2d 830, 834[9] (Mo.App.1975); *State v. Halk,* 524 S.W.2d 44, 48[7] (Mo.App.1975).

In *Stuart,* defendant failed to make a proper objection at the time testimony was offered concerning his silence while under arrest. The supreme court granted relief under the plain error rule, Rule 27.20(c), and reversed the conviction.

In *Benfield,* decided by this district of the court of appeals, there was an objection to evidence that the defendant, while under arrest and after being apprised of his right to remain silent, made no statement. The objection in *Benfield,* as in the case at bar, may not have been timely but this court, in dictum authored by this writer, said, "Had there been no objection, the result would be the same."

In *Halk,* the court recognized the holding in *Stuart* that a failure on the part of a person under arrest to volunteer an exculpatory statement is inadmissible. *Halk* was to a 2-to-1 decision. The majority held, under the facts in *Halk,* that there was no manifest injustice requiring invocation of the plain error rule. The majority pointed out that the testimony concerning the arrested person's failure "was somewhat unresponsive" and that "there was no deliberate attempt by the prosecutor to elicit a reply that the defendant refused to make a statement." The court also pointed out that there was no objection made to the testimony. The dissenting judge felt that Halk was entitled to a new trial.

Missouri procedure requires, in general, that constitutional questions be raised in the trial court at the earliest opportunity consistent with orderly proce-

dure; they may not be raised for the first time in the appellate court. Objections based upon constitutional grounds must be clearly and specifically stated and these objections must be kept alive and preserved throughout the case. *State v. Price,* 422 S.W.2d 286, 289[3] (Mo.1967); *State v. Evans,* 439 S.W.2d 170, 173[4] (Mo.1969).[2]

■ Contrary to the dictum in *Benfield,* violation by the state of the rule of evidence announced in *Stuart* does not automatically require reversal where there has been no timely objection. "It has been suggested that relief should always be given under Rule 27.20(c) when a 'constitutional' error is involved. We do not agree. Even a federal constitutional error may be considered harmless. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We will continue to 'review all the facts and circumstances in each case and determine on a case-to-case basis whether manifest injustice has resulted from the alleged error.' " *State v. Howard,* 540 S.W.2d 86, 87[1] (Mo. banc 1976). The court, in *Howard,* pointed out that precedents are of little value in determining when relief should be granted under the plain error rule.[3]

In the case at bar the state and the defendant, through their respective counsel, entered into a stipulation which the trial judge read to the jury immediately prior to the presentation of the evidence for the state. The court told the jury that the parties had stipulated to the effect that "Mr. Louie Pogue, the defendant, on June 27, 1976, in Shannon County, shot Mr. Scott Taylor with a .12-gauge shotgun several times in and around the chest and as a result of these wounds Scott Taylor died on June 27, 1976. They further stipulate that the gun in question will hold six shells. They further stipulate that there is blood on a pick handle and a shovel."

The evidence for the state was circumstantial. It showed that bad blood existed between the defendant and the victim. The state produced no eyewitness to the shooting, which occurred on land where the trailer home of the defendant and the trailer home of the victim were situated. It was the state's theory that the defendant shot Taylor because Taylor was "digging up water pipes" near a well house which served both trailer homes. The victim's purpose was to deprive the defendant of his water supply. The state's evidence tended to show that the shooting took place a considerable distance from defendant's trailer.

**2.** In *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the court held that where defendant had failed to make an objection on constitutional grounds to the admission of his confession, federal habeas corpus review was barred absent a showing of "cause" and "prejudice."

The court discussed "the contemporaneous objection rule" of the state of Florida, which required motions to suppress evidence (including confessions) be made before commencement of a trial. The court mentioned several factors in support of that procedure. "A contemporaneous objection enables a record to be made with respect to the constitutional claim when the recollections of witnesses are freshest, not years later in a federal habeas proceeding. . . . A contemporaneous objection rule may lead to the exclusion of the evidence objected to, thereby making a major contribution to finality in criminal litigation. . . . An objection on the spot may force the prosecution to take a hard look at its whole (sic) card, and even if the prosecutor thinks that the state trial judge will admit the evidence he

must contemplate the possibility of reversal by the state appellate courts or the ultimate issuance of a writ of federal habeas corpus based *on the impropriety of the state court's rejection* of the federal constitutional claim. . . . Any procedural rule which encourages the result that those proceedings [trial of a criminal case in state court] be as free of error as possible is thoroughly desirable, and the contemporaneous objection rule surely falls within this classification. . . . If a criminal defendant thinks that an action of the state trial court is about to deprive him of a federal constitutional right, there is every reason for his following state procedure in making known his objection." *Wainwright,* supra, 97 S.Ct. pp. 2507–2508.

**3.** For cases where the appellate court refrained from invoking the plain error rule to relieve a defendant who asserted that his constitutional right to remain silent had been violated, see *State v. Elmore,* 467 S.W.2d 915 (Mo.1971) and *State v. Johnson,* 529 S.W.2d 166 (Mo.App. 1975).

Defendant relied upon self-defense and the jury was instructed thereon. Defendant's evidence showed that as he and his wife Jimalee were approaching their trailer a verbal exchange took place between defendant and Taylor. Jimalee reached the trailer and went inside. Jimalee said: "I started in the house and I sensed that someone was coming. I heard Scott say, 'I'll get you.' . . . I looked over my shoulder and I saw Scott coming up the hill pretty fast."

The defendant said that as he was entering his home he say Taylor "running toward us pretty fast and it appeared to me that he had a knife in his right hand. I reached inside the door and grabbed a shotgun that was standing in the corner." The defendant "hollered" at Scott to hold it and Scott "kept coming." The shooting took place, according to the defendant, near his front steps.

The state's evidence, ably presented by the prosecutor, tended to show that the shooting took place near the well house. The nature of the victim's wounds, the location of the pick and shovel mentioned in the stipulation, and the location of a trail of blood, tended to support the state's theory and to be at war with the defendant's version.

The only eyewitnesses were the defendant and his wife, and her knowledge of the incident was somewhat limited. Manifestly any evidence which had a strong tendency to show that the defendant's version was a

fabrication, one not voiced at the scene, might well have influenced the verdict.[4]

■ Prior to the trial the defendant's counsel, pursuant to Rule 25.32(A)(2), filed a written request requiring the state to disclose "the substance of any oral statements made by the defendant [and] a list of all witnesses to the making." The state's response to that request, *signed by the prosecuting attorney,* was filed shortly before the trial. That response made no mention of sheriff Bolin or any statement allegedly made by the defendant to Bolin or in his presence. The only statement attributed to defendant and mentioned in the response was a telephone conversation which defendant had with a woman about ten hours prior to the shooting.

Scrutiny of the prosecutor's examination of Bolin discloses that the following information was elicited on direct examination: after defendant had been handcuffed and placed under arrest, and after he had been given the *Miranda* warnings, defendant was asked what had happened and he said he would rather not talk about it; he did not "explain that at all"; he did not explain why he did not want to talk about it"; he did not "make any explanation of the shooting at that time."

On redirect examination the prosecutor again asked Bolin if defendant said anything about the shooting "other than he wanted to see a lawyer."[5] The witness answered that defendant said he hoped the victim did not die.[6]

---

**4.** In *State v. Roth,* 549 S.W.2d 652 (Mo.App. 1977) the court held that the prosecutor committed reversible error in referring, during his closing argument, to the post-arrest silence of the defendant. The court said: "Nor is there any contradiction between a claim of self-defense made for the first time at trial and silence on that claim at the time of arrest." The court also said that the argument "allowed the inference that the claim of self-defense was a fabrication."

**5.** The state claims that the question asked by the prosecutor on redirect examination was justified by a portion of the cross-examination of Bolin by defense counsel. In view of other testimony, including certain statements made by the defendant prior to the giving of the

*Miranda* warnings and in view of the stipulated facts, this court finds no merit in that contention.

**6.** In *State v. Dowling,* 348 Mo. 589, 154 S.W.2d 749 (1941), defendant, while under arrest, told the officers he would not say anything until he had seen an attorney. He also said, "You have not got anything belonging to me"; and later declared he did not "know anything about it." The court, at p. 755, said: "Were these statements admissible? Under the great weight of authority we think not. There are numerous cases holding that it cannot be proven that the defendant said he declined to answer on the advice of counsel; or refused to give a statement; or declared he had nothing to say . . . . The [state] argues the foregoing rules do not

After the state had rested the defendant took the stand in his own behalf. On cross-examination by the prosecutor the defendant was asked if he "told the police or anyone that it looked like Scott had a knife." He replied, "No, I haven't until today." The prosecutor started to ask another question dealing with the same topic but, perhaps conscious of the impropriety, he informed the court that he was withdrawing the question.

Unlike the factual situation in *Halk,* supra, this record reflects deliberate and repeated attempts by the prosecutor to adduce testimony that the defendant, while under arrest, failed to volunteer an exculpatory statement. The prosecutor could not have been attempting to elicit the contents of a statement. The prosecutor had to know that defendant had made *no* statement to Sheriff Bolin or in his presence because the prosecutor himself, by his response to the request for disclosure, had said that the state had no evidence of such a statement. Silence, silence alone, was the fact so doggedly pursued.

In *Doyle v. Ohio,* 426 U.S. 610, 49 L.Ed.2d 91, 96 S.Ct. 2240 (1976), a 6-to-3 decision, the defendants, charged with selling marijuana, were arrested and given the *Miranda* warnings. They made no statement to the arresting officer but remained silent. At the trial, testifying on their own behalf, the defendants claimed that they had been "framed" and, for the first time, gave their exculpatory story. The court held that the prosecutor violated defendants' constitutional rights in cross-examining them as to why they had not told the frame-up story at the time of the arrest. The court held that "use of the defendants' post-arrest silence

in this manner violates due process." In *Doyle* defense counsel made timely objections.

The court rejected the state's argument that the state had a right to cross-examine the defendants as to post-arrest silence "for the limited purpose of impeachment." The court, at p. 2245, said: "[W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. . . . We hold that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment.[7]

Even the three dissenting justices in *Doyle* pointed out "the distinction between the prosecution's affirmative use of defendant's prior silence and the use of prior silence for impeachment purposes." The dissenters would have permitted the latter use under the facts in *Doyle.*

In the case at bar there was both "affirmative use of the defendant's prior silence" by the prosecution and "use of prior silence for impeachment purposes." The use was a persistent one to which objections, perhaps somewhat untimely, were posed. Defendant's motion for new trial raised the point.

A review of the whole record leads this court to the conclusion that manifest injus-

---

apply because the State is entitled to prove the entire conversation where part of it is shown . . . This is true where part of the same conversation is incriminating and part is not. But here no part of the conversation between appellant and Chief Carroll was incriminating. In his first answer appellant refused to talk until he had consulted an attorney; in the second he refused to say anything; and in the third he denied the accusation."

7. In footnote 11 on p. 2245 the court, in *Doyle,* said: "It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest."

tice has resulted from the violation of defendant's constitutional rights. Defendant does not claim that the state failed to make a submissible case.

The judgment is reversed and the cause remanded for a new trial.

All concur.